**In re GREENLEY ENERGY HOLD-INGS OF PENNSYLVANIA, INC., Debtor.**

**PENNSYLVANIA COMPANIES, INC. and the Scardino Trust, Frank Rosenbaum, Trustee, Plaintiffs,**

**v.**

**Andrew L. STONE, Defendant.**

**Bankruptcy No. 86–00056S.**
**Adv. No. 89–0970S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 1, 1990.

**174**

Robert M. Greenbaum, Philadelphia, Pa., for plaintiffs.

Timothy Hurley, Cincinnati, Ohio, Joseph A. Dworetzky, Philadelphia, Pa., for defendant.

Edward J. DiDonato, Philadelphia, Pa., for trustee.

Dominic Ciarimboli, Greensburg, Pa., trustee.

Mark Packel, Philadelphia, Pa., for Creditors' Committee.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

#### A. INTRODUCTION

This Opinion is in response to a Motion filed by Andrew L. Stone, the Defendant, to Dismiss the Complaint filed by the Plaintiffs in this proceeding. We shall dismiss the Complaint and this proceeding, but on jurisdictional grounds rather than the basis urged by the Defendant, *i.e.*, that the Plaintiffs are bound to the terms of the Trustee's confirmed Plan of Reorganization (hereinafter "the Plan"). We therefore proceed to dismiss the Complaint without prejudice solely on the ground that this court's limited post-confirmation jurisdiction to oversee the implementation of a plan permits us only to clarify patent ambiguities in a confirmed plan or interpret matters concerning the plan's operations which impact upon its effectuation. Finding no such ambiguities, nor any direct impact by the matters raised in this lawsuit on the operations of the plan confirmed in the instant proceeding, we conclude that our jurisdiction does not extend to hearing the evidence which the Plaintiffs wish to present at this time regarding latent ambiguities in the Plan.

To further explain our decision, we note specifically that we do not hold whether there are or were agreements among the Plaintiffs and the Defendant or the bankruptcy trustee outside of the Plan which address the distribution of funds that the Defendant receives under the Plan. These issues do not affect the Plan and it was not necessary that they be raised prior to confirmation. They do not involve the Debtor or its estate but merely involve the interrelationship of non-debtor individuals. They are, therefore, not within our jurisdiction to

decide, causing us to dismiss the Complaint without prejudice.

## B. FACTUAL AND PROCEDURAL BACKGROUND

A detailed review of the factual background of this case is set forth in our Opinion discussing the Trustee's compensation, reported at 94 B.R. 854, 855 (Bankr.E.D.Pa.1989) and in the District Court's opinion reversing our decision on that point, 102 B.R. 400, 401–02 (E.D.Pa.1989). We do not repeat the facts recited there at length herein, but we believe that a brief summary of them would be helpful.

The instant Chapter 11 case was filed on January 6, 1986. Prior to this filing, two factions of the Debtor's stockholders were engaged in litigation in the United States District Court for the Eastern District of Pennsylvania regarding stock ownership. *See Syphers v. Scardino*, 802 F.2d 448 (3d Cir.1986), *aff'g*, No. 85–3696, 1985 WL 4283 (E.D.Pa. Dec. 5, 1985). During the course of this litigation, Edward J. DiDonato, Esquire (hereinafter "DiDonato"), was appointed as receiver of the Debtor.

The dissention between the Debtor's shareholders continued post-petition, leading to an agreement of April 4, 1986, by, apparently, all interested parties, to the appointment of a trustee in the bankruptcy case. On May 12, 1986, Dominic Ciarimboli, Esquire (hereinafter "the Trustee"), was appointed as trustee. DiDonato remained active in the case as lead counsel of the law firm employed to represent the Trustee.

The Debtor is a corporation which was duly incorporated under the laws of the Commonwealth of Pennsylvania on or about September 27, 1982. The Debtor's principal business is reprocessing coal refuse. In operating its business, the Debtor accumulates refuse coal or "gob" piles, which it reprocesses. When the prices of competitive fuels decreased in the early 1980's, the Debtor's business decreased and its main asset, four large gob piles, became an environmental hazard rather than a valuable asset. In fact, the Debtor was being fined $750 per day by the Pennsylvania Department of Environmental Resources for maintaining the piles and was directed to remove the piles pursuant to a massive reclamation project which it was estimated would cost thirty million ($30,000,000) dollars. At the time that the Trustee took control of the Debtor, it had practically ceased operations.

The Trustee utilized his business connections in the coal industry to salvage the Debtor's business by negotiating five interrelated agreements with Babcock and Wilcox (hereinafter "B & W") pursuant to which the Debtor would supply its coal refuse to a newly-formed B & W subsidiary, the Ebensburg Power Company ("EPC"), on a long-term basis. B & W intends to utilize the refuse coal in an innovative plan to convert bituminous waste coal into power. The district court termed Mr. Ciarimboli's accomplishments for the Debtor as a "small miracle." 102 B.R. at 401.[1]

A Plan of Reorganization featuring the five agreements with EPC and proposing to pay secured and unsecured creditors one hundred (100%) percent of their claims according to a negotiated schedule and to provide shareholders a return on their investment was supported by both factions of the Debtor's shareholders and its creditors, and was ultimately confirmed in a modified version on July 14, 1988.

On October 20, 1989, over fifteen (15) months after the Plan was confirmed, the Pennsylvania Companies, Inc. ("PCI") and the Scardino Trust; by Frank Rosenbaum as its trustee ("the Trust") (PCI and the Trust are collectively referred to as "the Plaintiffs"), filed the Complaint precipitating the instant proceeding and this Opinion. PCI is a Pennsylvania corporation and the Trust is a Pennsylvania trust established by Frank G. Scardino on behalf of his children, Meredith, Kimberly and Karen. The only Defendant named in the Complaint is Andrew L. Stone, an individual residing in Cincinnati, Ohio, and a stockholder and creditor of the Debtor.

---

**1.** *But see* pages 178–79 n. 2 *infra.*

The Complaint, filed pursuant to Bankruptcy Rules 7001(2) and (9), asks this court to determine the Plaintiffs' interests in stock of the Debtor and entitlement to distributions, corporation representation on the Debtor's Board of Directors, and corporate voting under the confirmed Plan of Reorganization. Before discussing the allegations of the Plaintiff in detail, and in order for them to be understood, a review of certain provisions of the Disclosure Statement and Plan of Reorganization presented to and confirmed by this court, respectively, are necessary. On May 2, 1988, the Trustee filed a Modified Disclosure Statement representing that fifty-five (55%) percent of the Debtor's stock was held by Andrew L. Stone ("Stone") with the remaining shares of stock held by a group of equity investors headed by Vance Syphers and Stephen Dunn (hereinafter "the Syphers–Dunn Group"). No objections were filed with regard to these or any other representations in the Modified Disclosure Statement.

The Plan, also proposed by the Trustee on May 2, 1988, provides for, *inter alia*, distributions to the Debtor's stockholders, and sets forth the procedure pursuant to which directors of the Debtor are to be selected in the future. The Plan defines certain shareholders and groups of shareholders who will receive distributions thereunder. Section 2.26 of the Plan defines the Syphers–Dunn Group as

[t]hat group of equity security holders comprised of Vance Syphers, Stephen Dunn and those included on the list attached hereto as an Exhibit, having a minority ownership interest in outstanding stock of Greenley.

Pursuant to an Exhibit attached to the Plan, in addition to Messrs. Syphers and Dunn, nineteen (19) other members of the Syphers–Dunn Group are identified.

Section 2.27 of the Plan defines Andrew Stone as an "[e]quity security holder having a majority ownership interest in outstanding stock of Greenley and holder of Claims against the Debtor."

With respect to the selection of directors, Section IV of the Plan provides, in pertinent part, as follows:

Upon the Effective Date, the Corporate Charter, Articles of Incorporation and/or By–Laws are hereby amended to provide as follows: For the longer of ten (10) years or when the cumulative distribution to the Syphers–Dunn Group (without regard to present value) shall equal no less than $4,123,714.00 ("Balanced Director Period"), the Board of Directors shall be composed of two (2) directors to be selected by the Syphers–Dunn Group of shareholders and two (2) directors to be selected by Andrew Stone, with the fifth director to be chosen by the remaining directors, or, in the event they cannot agree, by a Court of competent jurisdiction. Upon the expiration of the Balanced Director Period, the shareholders shall elect the directors.

With respect to distributions to be made to the Debtor's shareholders from the estate, Section V, paragraph F of the Plan provides, in pertinent part, as follows:

*F. Class IV—Class of Equity Security Holders*

All interests of Class IV Equity Security Holders will continue in existence. On the Shareholder Distribution Date, the Equity Security Holders shall become entitled to payments of the Net Income Available for Distribution to Shareholders. The Syphers–Dunn Group will be entitled to eighty (80%) percent, and Stone shall be entitled to twenty (20%) percent of Net Income Available for Distribution to Shareholders from the Shareholder Distribution Date and continually for nine (9) years thereafter. Commencing ten (10) years after the Shareholder Distribution Date and continuing for fourteen (14) years thereafter, Stone will be entitled to sixty (60%) percent of all Net Income from Operations, and the Syphers–Dunn Group will be entitled to the balance of the same, namely, forty (40%) percent ... Commencing twenty-five (25) years after the Shareholder Distribution Date and continuing thereafter, Stone will be entitled to eighty (80%) percent of any Net Income from Opera-

tions realized by Greenley from any source or sources, and the Syphers–Dunn Group will be entitled to the balance of the twenty (20%) percent.

Within the year after the facility becomes operational, the Debtor shall cause to be returned to Andrew Stone the collateral pledged by him to Pennsylvania Department of Environmental Resources in connection with the Debtor's DER Permits relating to Mine # 37 and, in connection with such return, Syphers–Dunn Group acknowledges that the Debtor may dilute their share of the Net Income Available for Distribution to Shareholders in that year by more than ten (10%) percent.

Unrelated Business Profits shall be allocated and distributed to the shareholders in accordance with their respective number of shares owned.

Further, Section IX, Paragraph 3.1 of the Plan, entitled "Effect of Confirmation," provides as follows:

Upon the Effective Date, all of the provisions of this Plan, including all Exhibits hereto, shall be binding on the Debtor, all Claimants, all Interest Holders and all other entities who are affected (or whose interests are affected) in any manner by the Plan; specifically excluding EPC, whose interests are not affected by this Plan but only by the Agreements and the Loan Agreement.

Finally, Section IX, Paragraph 3.2 of the Plan provides, with respect to discharge, in pertinent part:

The Plan reflects a number of compromises on the part of Mr. Stone, the Syphers–Dunn Group and other interested parties. . . . Accordingly, except with respect to and to the extent of the claims and equity positions recognized and allowed as set forth in the Plan, the Debtor, Andrew Stone, the Syphers–Dunn Group, the Trustee and all shareholders and former shareholders of the Debtor shall be deemed to have waived, and to have released and discharged each other from any claim, demand, loss, liability, right, or cause of action, whether known or unknown or foreseeable or unforesee-

able, arising from or in any way relating to Greenley, its organization, its management, or its operation, including, without limitation, any claims of fraud, mismanagement, breach of fiduciary duty, misappropriation of assets, or breach of professional responsibility and any claims under RICO, the securities law, or the Bankruptcy Code.

Both the Trust, in Count I of the Complaint, and PCI, in Count II of the Complaint, aver that all references by the Trustee to Stone in the Plan were intended to mean "Stone Group" or, in the alternative, were recited to mean Andrew Stone only due to his alleged misrepresentations that he owned all shares of the Debtor not held by the Syphers–Dunn Group. The Plaintiffs further aver that Stone's stated percentage portion of Distribution of Net Income Available for Distribution to Shareholders under the Plan comes directly from Stone's representations of his ownership of the Debtor's stock and not from any agreement or compromise outside the issue of stock ownership.

The Trust further avers that it holds 34,700 shares of the Debtor's stock. PCI avers that it holds shares of the Debtor's stock but does not reveal the number of shares that it owns. The Plaintiffs aver that Dino Persio, Jay Fischer, Jeffrey Valocchi, Vincent Philomeno, and Sidney Pine also hold shares of the Debtor and, therefore, although not Plaintiffs in this action, are members of the "Stone Group."

By virtue of their stock ownership in the Debtor, the Trust and PCI claim that they are entitled to a *pro rata* portion of Stone's Distribution of Net Income Available for Distribution to Shareholders and that each of them is entitled to elect one Director of the Debtor pursuant to Section IV of the Plan. The Plaintiffs, even though they were not mentioned in either the Plan or the Disclosure Statement, ask this court to determine what equity interests they have in the Debtor and, in accordance with such equity interests, what rights they have under the Plan to Distributions of Net Income Available for Distribution to Shareholders and to select Directors of the Debtor.

In response to the Complaint, the Defendant, on December 1, 1989, filed a Motion to Dismiss the Complaint with prejudice pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7012(b) and Federal Rule of Civil Procedure ("F.R.Civ.P.") 12(b)(6) for failure to state a claim upon which relief can be granted. He argues first that, pursuant to 11 U.S.C. § 1141(a) and (d)(1)(B), the confirmation of the Plan released and discharged the liabilities of the parties *inter se,* including those between the Trust and PCI and Stone. Next, he contends that the Plaintiffs are seeking to effectively revoke the confirmation order due to fraud on the part of Stone which, pursuant to 11 U.S.C. § 1144, is barred by the 180–day limitations period for such challenges to confirmed plans. Finally, he argues that the Plaintiffs are bound to the terms of the confirmed Plan under the holding of, *inter alia,* the Third Circuit Court of Appeals in *In re Szostek,* 886 F.2d 1405, 1408–10 (3d Cir.1989).

The Plaintiffs, subsequent to instituting the instant proceeding, also filed an additional adversary proceeding in this case, at Adv. No. 89–1039, on November 16, 1989, naming only the Debtor as defendant, in which they sought to prevent the convening of any meetings of its Board of Directors until this proceeding were resolved. On December 6, 1989, the date of the trial in this proceeding and a hearing on a motion for preliminary relief in Adv. No. 89–1039, the Plaintiffs indicated (1) a willingness to voluntarily dismiss Adv. No. 89–1039, apparently due to an agreement that no Board meetings will occur until this proceeding is resolved, which they acted upon by filing a praecipe to withdraw the Complaint on December 19, 1989; and (2) a desire to respond to the Motion to Dismiss. We accorded them until January 8, 1990, to file and serve their response to the Defendant's Motion. We also directed the Trustee to file a Statement or Brief of his position in this controversy on or before December 29, 1989.

The Trustee, pursuant to our Order, filed a brief Statement reciting that

[i]f deposed or called to testify, Mr. Ciarimboli would indicate that it was his understanding that Andrew L. Stone was acting on behalf of a number of other shareholders.

It should also be pointed out that neither Mr. Ciarimboli nor his counsel were ever totally clear as to the ownership of all issued stock of Greenley. It was the Trustee's understanding that there were numerous transfers of stock by and between the parties and Mr. Stone. However, the Trustee also believed that, over the course of this Chapter 11 proceeding, all creditors, parties in interest and shareholders received notice.

Mr. Ciarimboli respectfully declines to state any position regarding the merits or lack thereof of the pending Motion to Dismiss.

More graphic are the contents of Affidavits of Dino S. Persio, Esquire., and Jay G. Fischer, Esquire, alleged "Stone Group" members, which were filed by the Plaintiffs with and in support of their Response and Brief in opposition to the Defendant's Motion to Dismiss. Persio states that he was aware that the term "Stone Group" was not used, and that his interest was not "recognized," in the Plan or Disclosure Statement but that, "[b]ased upon conversations and correspondence with the Trustee ... I did not object ... as it was my understanding that 'Andrew Stone,' as defined in the Plan, represented and was intended to mean 'Stone Group,'..." Fischer, formerly the Debtor's General Counsel, in addition to echoing Persio's above comments, further states that Stone's counsel and the Trustee informed him that his direct involvement would adversely affect the Debtor's ability to reorganize and that

Dominic Ciarimboli, Esquire, specifically advised and recommended that neither I nor Frank C. Scardino should object to the Plan when presented for approval because he would recognize or litigate our right to a proportionate share of the Stone proceeds when income was available for distribution if we could produce stock certificates verifying our share-

holder status.[2]

In light of these averments, the Plaintiffs argue that the Plan terms are ambiguous and require judicial interpretation by this court. They thus contend that they seek "clarification" of the Plan terms, not revocation of the Order confirming the Plan, and are not barred from doing so by res judicata arising from the confirmation order.

## C. DISCUSSION

1. *The instant Complaint may be Dismissed Without Prejudice Pursuant to Federal Rule of Civil Procedure 12(b)(1) Sua Sponte If This Court Determines That It Lacks Jurisdiction over the Subject Matter of the Complaint.*

The Defendant filed his Motion to Dismiss pursuant to B.Rule 7012(b), which incorporates F.R.Civ.P. 12(b)(6). In a footnote to his Brief, he invokes, in the alternative, B.Rule 7056, which incorporates F.R. Civ.P. 56. F.R.Civ.P. 12(b)(6) permits a defendant to file, as Stone has done, a motion to dismiss a complaint for failure to state a claim for which relief can be granted prior to filing its Answer to the Complaint. The rule further provides that if a motion asserting the 12(b)(6) defense is filed and matters outside of the Complaint are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of in accordance with F.R.Civ.P. 56. *See, e.g., In re Amatex Corp.,* 97 B.R. 220, 223–24 (Bankr. E.D.Pa.), *aff'd sub. nom. Amatex v. Stonewall Insurance Co.,* 102 B.R. 411 (E.D.Pa. 1989). F.R.Civ.P. 56 allows us to grant summary judgment for the Defendant if we determine from our "examination of the allegations in the pleadings and any other evidential source available that no issue as to a material fact remain for trial, and the moving party is entitled to judgment as a matter of law." *In re Jackson,* 92 B.R. 987, 990 (Bankr.E.D.Pa.1988), quoting *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

■ The Defendant did not, however, invoke F.R.Civ.P. 12(b)(1), which is also incorporated into bankruptcy jurisprudence by B.Rule 7012(b) and provides for dismissal of a claim in the event of lack of jurisdiction over the subject matter of the claim. The Defendant sought a dismissal of this proceeding *with* prejudice. However, "a dismissal under [F.R.Civ.P. 12] b(1) is not on the merits and is thus not given res judicata effect," 2A J. MOORE, FEDERAL PRACTICE, ¶ 12.07[2.1], at 12–45 (2d ed. 1989); and hence is *without* prejudice. The Plaintiffs also do not raise or discuss any jurisdictional issues in their submissions.

■ A federal court, including a bankruptcy court, being a court of limited jurisdiction, must nevertheless itself raise the issue of its subject matter to hear an action before it at any time when it is appropriate to do so and is obliged to dismiss a proceeding before it *sua sponte* if it finds subject matter jurisdiction to be absent. *See, e.g., Clark v. Paul Gray, Inc.,* 306 U.S. 583, 588, 59 S.Ct. 744, 750, 83 L.Ed. 1001 (1939); *In re Hall's Motor Transit Co.,* 889 F.2d 520, 522 (3d Cir.1989); *Athens Community Hospital, Inc. v. Schweiker,* 686 F.2d 989, 992 (D.C.Cir.1982), *modified on reh'g,* 743 F.2d 1 (D.C.Cir.1984); *Trent Realty Associates v. First Federal Savings & Loan Ass'n,* 657 F.2d 29, 36 (3d Cir.1981); *In re Howard National Corp.,* 70 B.R. 278, 281 n. 3 (N.D.Ill.1987); *In re Block K Associates,* 55 B.R. 630, 633 (Bankr.D.Colo.1985); *In re Wildman,* 30 B.R. 133, 140 (Bankr.N.

---

2. The averments contained in these Affidavits tarnish somewhat the Trustee's status as a "miracle worker." *See* 102 B.R. at 401. They suggest that, in the interests of confirming a Plan ultimately leading to his recovery of $362,500 in commissions, the Trustee attempted to effect a side "deal" not included in the Plan, and, in the process, may have made misrepresentations to interested parties. We also note that the Trustee and his brother garnered additional compensation totalling more than $500,000 as a result of confirmation of this Plan. *See* 94 B.R. at 860 n. 5. Finally, we observe that we tolerated the Trustee's apparent conflict in obtaining employment for himself and his brother as a result of his engagement as Trustee solely because this was set forth in the presumably-accurate Plan and Disclosure Statement. *Id.* at 861. In view of what has now come to light, we are not certain that this decision was appropriate.

**180**

D.Ill.1983); and 2A J. MOORE, *supra,* ¶ 12.23, at 12–202 to 12–205. *Cf. In re Almarc Corp.,* 94 B.R. 361, 365 (Bankr.E. D.Pa.1988) (parties cannot confer subject matter jurisdiction to hear an unrelated, post-confirmation dispute by consent).

■ In so determining whether it has subject matter jurisdiction to hear an action, a court may consider matters outside of the complaint, as in a F.R.Civ.P. 56 motion, without converting the motion to a Rule 56 motion. *See* 2A J. MOORE, *supra,* ¶ 12.07[2.–1], at 12–47 to 12–49.

■ We must therefore carefully examine the record, including all of the submissions to date, to determine whether we have subject matter jurisdiction to hear this proceeding. Concluding, as we do, that we lack such jurisdiction, we can proceed no further, not even to consider the Defendant's F.R.Civ.P. 12(b)(6) motion in the alternative. Moreover, our decision carries no weight on the merits of that issue or any other issue raised in this proceeding.

2. *This Court's Post–Confirmation Jurisdiction Is Limited Only to Matters Concerning Operation of the Plan and Not to "Interpreting" Aspects of a Chapter 11 Plan of Reorganization Which Are Unambiguous.*

■ In considering whether this court retains post-Confirmation jurisdiction to hear this matter, we begin by noting the observations of our colleague, the Honorable Bruce Fox, that "[s]ince at least 1944, courts have recognized the competing interests between retaining jurisdiction after confirmation until entry of the final decree (*see* Bankr.R. 3020), and ending the 'tutelage' status of reorganization, a period 'which may limit and hamper [the corporation's] activities and throw doubt upon its responsibility.' *North American Car Corp. v. Peerless Weighing & Vending Machine Corp.,* 143 F.2d 938, 940 (2d Cir. 1944)." *In re Cinderella Clothing Industries, Inc.,* 93 B.R. 373, 376 (Bankr.E.D.Pa. 1988).

There is no doubt that the bankruptcy court's jurisdiction continues post confirma- tion to "protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation." *Id.,* quoting *In re Dilbert's Quality Supermarkets, Inc.,* 368 F.2d 922, 924 (2d Cir.1966). *See also* 11 U.S.C. § 1142; and *Almarc, supra,* 94 B.R. at 363–65.

However, courts have attempted to balance the need to retain jurisdiction post-confirmation with the need to end the reorganization process at some point. For example, in *In re J.T. Gerken Trucking, Inc.,* 10 B.R. 203, 204 (Bankr.N.D.Ohio 1981), the court concluded that "affirmation of the [collective bargaining] agreement in the plan does not confer jurisdiction upon the [bankruptcy] court over post confirmation controversies. A confirming court's jurisdiction is limited to matters concerning the operation of the plan." *See also Hall's Motor Transit, supra,* 889 F.2d at 522 ("The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the estate."); *In re Goodman,* 809 F.2d 228, 232 (4th Cir.1987) (Section 1142 of the Bankruptcy Code limits the bankruptcy court's post-confirmation authority to matters concerning implementation and execution of confirmed plan); *In re Sultan Corp.,* 81 B.R. 599, 602 (Bankr. 9th Cir.1987) (Confirmation of a Chapter 11 plan does not automatically terminate the bankruptcy court's jurisdiction; but it retains jurisdiction of only such matters as are necessary for the successful consummation of the plan); *In re Fortner Oilfield Services, Inc.,* 49 B.R. 9, 10 (Bankr.N.D.Tex.1984) ("The court maintains [post confirmation] jurisdiction sufficient to oversee the execution of the plan. . . . However, while the bankruptcy court retains jurisdiction to oversee the plan there are certain pre-confirmation incidences of jurisdiction that are lost or altered by the confirmation."); *In re Westholt Manufacturing, Inc.,* 20 B.R. 368, 372 (Bankr.D.Kan.1982) ("At confirmation, all the property of the estate is vested in the debtor, thereby terminating the estate's existence, although the court has continued jurisdiction under section 1142 [footnote omitted] to oversee the plan's execution.");

and *In re Georgetown of Kettering, Ltd.*, 22 B.R. 312, 317 (Bankr.S.D.Ohio 1982) (Court lacks jurisdiction over a post-confirmation proceeding regarding rights arising under the plan with respect to parties not otherwise before the court and property that has been transferred out of the estate).

Section 1142(b) of the Bankruptcy Code, referred to by several of the cases cited above, concerns the implementation of Chapter 11 plans and provides that

> [t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

With respect to post-confirmation attorneys' fees, the court in *In re Tri–L Corp.*, 65 B.R. 774, 779 (Bankr.D.Utah 1986), stated that, while "[i]t is contrary to the purposes of the Code and the judicial function for the bankruptcy court to retain jurisdiction over every aspect of the reorganized [post confirmation] debtor, ... the court must retain some jurisdiction after confirmation to see that the plan is consummated." Further, the court concluded, *id.* at 778, that "the court may expressly retain jurisdiction over the plan, during its consummation, under a provision of the plan itself or the order of confirmation." In support of this conclusion, the court refers to 5 COLLIER, *supra*, ¶ 1142.01[1], at 1142–4 to 1142–5.

Similarly, in *In re Allied Technology, Inc.*, 25 B.R. 484, 499 (Bankr.S.D.Ohio 1982), the court concluded that § 1142 grants post-confirmation jurisdiction to bankruptcy courts and that "[t]he key document for determination of this Court's post confirmation jurisdiction is ... the Plan itself, which is binding on all creditors." The court in *Allied Technology* found that it had jurisdiction to resolve the post-confirmation dispute between the debtor and its lessor at issue therein be-cause the plan specifically stated that it retained such jurisdiction.

However, the court in *Tri–L* cautions, *id.* at 778, that a reservation of jurisdiction in the plan or confirmation order "beyond what is necessary to effectuate the plan of reorganization is beyond the power of the bankruptcy court." *See also Claybrook Drilling Co. v. Divanco*, 336 F.2d 697, 700–01 (10th Cir.1964); *Reese v. Beacon Hotel Corp.*, 149 F.2d 610, 611 (2d Cir. 1945); *In re Flatbush Ave.–Nevins St. Corp.*, 133 F.2d 760, 762 (2d Cir.1943); and *Almarc*, 94 B.R. at 365–66.

In *In re Hudson Feather & Down Products, Inc.*, 36 B.R. 466, 467–68 (E.D.N.Y. 1984), the court held that where the confirmed plan of reorganization specifically provided that the bankruptcy court would retain jurisdiction over adversary proceedings pending at the time of confirmation, the bankruptcy court retained post-confirmation jurisdiction over a pending state court action. Other courts finding the reservation of jurisdiction clauses in the plan or confirmation order very persuasive on the issue of the bankruptcy court's post confirmation jurisdiction are *In re Tilco, Inc.*, 558 F.2d 1369 (10th Cir.1977); and *In re J.M. Fields, Inc.*, 26 B.R. 852 (Bankr.S. D.N.Y.1983). *See also In re Pittsburgh Terminal Coal Corp.*, 183 F.2d 520, 522 (3d Cir.1950), *cert. denied sub nom. Pittsburgh Terminal Realization Corp. v. Heiner*, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950) (when a debtor corporation has been organized, whether the jurisdiction of the bankruptcy court is concluded depends upon the "provisions of the plan as confirmed and reservations, not inconsistent therewith, contained in the order of confirmation"). *But see Almarc, supra*, 94 B.R. at 363, 365, 366 (parties cannot agree to confer jurisdiction upon a bankruptcy court which extends its otherwise appropriate range of subject matter; court holds that a plan provision that this court had jurisdiction of all service contracts made prior to or during proceedings, but that local state court or this federal district court had exclusive jurisdiction of post-petition service contracts required dismissal of a claim

based on post-petition service agreement in this court).

Section XI of the Debtor's Plan retains jurisdiction for this court over several post-confirmation matters. We are not persuaded that the grant of jurisdiction contained in Section XI of the Plan extends to the issues raised by the Plaintiffs in their Complaint. Section XI, paragraph (a) of the Plan states that this court retains jurisdiction to "determine the allowance or disallowance of Claims and Interests." The Plaintiffs, however, despite admitting timely knowledge of the relevant proceedings and after reviewing the pertinent documents, failed to pursue or otherwise protect their claims. We have already determined the allowance and disallowance of claims and interests properly filed or pursued in this case and will not entertain new claims and interests at this time.

Section XI, paragraph (g) of the Plan provides that this court retains jurisdiction to "make such orders as are necessary and appropriate to carry out the provisions of this Plan." This provisions purports to grant this court jurisdiction to enforce the terms of the Plan as we interpret them. As we hold at pages 182–84 *infra*, we find no patent ambiguities in our interpretation of the Plan and our limited jurisdiction prohibits us from examining the Plaintiffs' claims further.

As we have seen, courts differ in opinion as to the post-confirmation jurisdiction of bankruptcy courts. In light of § 1142 of the Bankruptcy Code, Section XI of the Plan, and relevant case law, we concur with the court in *In re Morgan & Morgan, Inc.*, 24 B.R. 518, 521 (Bankr.S.D.N.Y. 1982), when it states:

> The order of confirmation marked the commencement of the period when a debtor is weaned from dependence on the bankruptcy court's injunctive powers so as to stand on its own feet with respect to post-confirmation matters.

We also concur with the opinion expressed by the court in *J.M. Fields, supra*, 26 B.R. at 854, which stated that the bankruptcy

Court's post-confirmation authority is restricted to only those matters pending at the time of confirmation. This grant is not one which keeps the debtor corporation in "permanent tutelage" to the Court, subject to Court supervision and control over all aspects of corporate conduct. *Claybrook Drilling Co. v. Divanco, Inc.*, 336 F.2d 697, 701 (10th Cir.1964).

The dispute between the Plaintiffs and Stone does not, in our view, affect the consummation of the Plan vis-a-vis other creditors on one hand and Stone and the Plaintiffs on the other hand, but only involves a dispute concerning the interests of Stone vis-a-vis the Plaintiffs. This sort of intra-Stone-related-parties dispute does not, in our view, significantly affect consummation of the Plan. The Plan fails to indicate any intention that we continue to exercise jurisdiction to hear disputes between the various groups of the Debtor's shareholders. We therefore conclude that, unless we find patent ambiguities in the Plan, we lack jurisdiction to entertain new evidence presented at this time which is offered to show that the Plan does not say what the Trustee intended it to say.

### 3. The Plan Is Not Ambiguous in Describing the Interests of Andrew Stone in the Debtor.

■ After a careful review of the terms of the Plan, we conclude that, as to the matters raised by the Plaintiffs regarding their interests in the Debtor vis-a-vis that of Stone, it is not ambiguous. We are not convinced that the Trustee intended all references to "Stone" or "Andrew Stone" in the Plan to mean "Stone Group." The Trustee clearly knew how to refer to a group of shareholders when he desired to do so, as he demonstrated in his reference to and definition of the Syphers–Dunn Group. When defining the Syphers–Dunn Group, the Trustee referred to "equity security holders," in the plural, and attached as an Exhibit to the Plan a list of the members of the Syphers–Dunn Group. When defining Andrew Stone, however, the Trustee referred to a single equity security holder who also is a claimant against the Debtor.

Again, no ambiguity exists in the meaning of the terms "Andrew Stone" or the "Syphers–Dunn Group." The former clearly refers to an individual; the latter to a group of individuals. Since no patent ambiguities exist with regard to the definition of these terms, we lack jurisdiction to entertain any evidence about how these terms should be interpreted.

In its Brief, at page 16, the Plaintiffs state that "the meaning of the term 'Andrew Stone' is unclear, so to [sic] are these provisions which confer rights to 'Andrew Stone' as an equity security holder." We disagree. Since we find that the meaning of the them "Andrew Stone" as defined and used in the Plan is unambiguous, so too are those provisions conferring rights upon Andrew Stone or Stone. Clearly, these rights are conferred upon an individual and not upon some unreferenced group.

The Plaintiffs claim that the above quoted definitions of the Syphers–Dunn Group and Andrew Stone, when read in conjunction with the "Release and Discharge" provision of the Plan set forth at page 177 *supra,* create confusion regarding the ownership of the Debtor's stock. The portion of the Release and Discharge provision singled out by the Plaintiffs as being the source of the confusion reads

> [a]ccordingly, except with respect to and to the extent of the claims and equity positions recognized and allowed as set forth in the Plan, the Debtor, Andrew Stone, the Syphers–Dunn Group, the Trustee, and *all shareholders and former shareholders of the Debtor* ... (emphasis added).

The Plaintiffs claim that when, in this provision of the Plan, the Trustee refers to Andrew Stone, the Syphers–Dunn Group, and "all shareholders and former shareholders," he is referring to the Plaintiffs and acknowledging confusion about the ownership of the Debtor's stock. However, we interpret the plain language of this provision to mean that, unless a claim or equity position is recognized and provided for in the Plan, any shareholders, past or present, have waived their rights and claims against each other, the Trustee, and the Debtor. It appears to us that the Trustee included the phrase "all shareholders and former shareholders" in this Plan provision to ensure that it was all-inclusive and left no doubt that only those claims and equity provisions recognized and provided for in the Plan are to receive distributions from the Debtor's estate.

The Plaintiffs point to several other provisions of the Plan which they allege are ambiguous. The Plan provides that unrelated business profits are to be "allocated and distributed to shareholders in accordance with the respective number of shares owned." The Plaintiffs contend that this provision is ambiguous because other distribution provisions in the Plan, unlike this one, set the percentages of distributions which Stone and the Syphers–Dunn Group are to receive, while this provision merely states that distributions to shareholders with respect to unrelated business profits are to be made in accordance with their ownership percentages. The Plaintiffs argue that the general reference to the shareholders rather than specific references to Stone and the Syphers–Dunn Group demonstrates confusion regarding the ownership of the Debtor's stock.

We find no ambiguity or confusion in these passages. We read this provision as simply requiring that unrelated business profits are to be distributed to Stone and the Syphers–Dunn Group in accordance with their stock ownership rather than in accordance with their previously-stated percentages for distribution. The provision remains applicable if any shares are transferred to new owners at some point in the future.

The Plaintiffs also claim that there is ambiguity in the Plan's provision which sets forth the method for the selection of the Debtor's directors. According to Section IV of the Plan, set forth at page 176 *supra,* the Debtor's directors are selected by Stone and the Syphers–Dunn Group during the "Balanced Director Period," but are to be selected by the shareholders upon the expiration of the Balanced Director Period. Again, the alleged ambiguity escapes us. It is quite clear to us that the Plan provides

that Stone and the Syphers–Dunn Group are to select the directors initially and, then, at some future time, the shareholders, whoever they may be at that time, are to select the directors.

The Plaintiffs contend that this court must hear additional facts before it can interpret the foregoing alleged ambiguities of the Plan. However, we conclude that the Plan is unambiguous on its face and we are able to easily interpret its provisions without hearing any evidence to describe what these provisions mean. *Cf. In re Penn Central Transportation Co.,* 831 F.2d 1221, 1225–28 (3d Cir.1987); and *In re St. Mary Hospital,* 101 B.R. 451, 461 (Bankr.E.D.Pa.1989) (an unambiguous contract must be interpreted as it is written, not how the parties might have meant it or interpreted it).

4. *Because the Plan Terms Which the Plaintiffs Desire Us to Interpret in This Proceeding Are Not Ambiguous and the Dispute at Hand Involves the Interests of Third Parties, We Find an Absence of Subject– Matter Jurisdiction to Hear This Matter.*

Since we conclude that there are no ambiguities in the Plan, all that remains of the Complaint are issues between non-debtors involving property *after* it has left the estate. Courts have generally held that bankruptcy courts lack jurisdiction to hear collateral disputes between non-debtors. For example, in *In re Paso Del Norte Oil Co.,* 809 F.2d 329, 331 (6th Cir.1985), the court concluded that bankruptcy courts have no power to resolve collateral disputes between third parties that do not involve the debtor or its property. *Accord, Hall's Motor Transit, supra,* 889 F.2d at 522.

■ The bankruptcy courts would have jurisdiction to resolve such disputes if it were impossible to administer the estate without determining the controversy. *See Almarc, supra,* 94 B.R. at 364–65. While the allegations in the Complaint, at first blush, appear to involve property of the estate, they actually involve the disposition · of property pursuant to alleged oral agreements between the Plaintiffs and Stone and the Trustee after it has left the estate. Resolution of such issues are not necessary for the administration of the estate or the implementation of the Plan. *See also In re Edwards,* 100 B.R. 973, 979 (Bankr.E.D. Tenn.1989); *Almarc, supra,* 94 B.R. at 364–65; *In re Gillis,* 92 B.R. 461, 467 (Bankr.D.Haw.1988); *In re M. Paolella & Sons, Inc.,* 85 B.R. 965, 970 (Bankr.E.D.Pa. 1988); *In re Phillips House Associates, Inc.,* 64 B.R. 912, 915–16 (Bankr.W.D.Mo. 1986); and *In re Janis,* 60 B.R. 349, 353 (Bankr.S.D.Fla.1986).

In *In re Terracor,* 86 B.R. 671, 676–77 (D.Utah 1988), it was determined that the bankruptcy court had jurisdiction to resolve a dispute between a creditor and a third party where an agreement between these parties was attached to and approved as part of the debtor's plan. We did not know of any alleged agreements between the Plaintiffs and Stone or the Trustee until the Complaint was filed. There is no allegation of any written agreements. Clearly, no such agreements were attached to or referenced in the instant Plan, which might serve to bring their· interpretation within this court's jurisdiction.

■ We agree with our colleague, Judge Fox, that "there exists a residue, albeit limited, of court authority over a confirmed chapter 11 case." *Cinderella,* 93 B.R. at 377. Our post-confirmation jurisdiction is limited by Bankruptcy Code § 1142(b) to only those matters the resolution of which are "necessary for the consummation of the plan." In light of the provisions of § 1142(b), we conclude that we retain post-confirmation jurisdiction for the limited purpose of resolving disputes arising from the presence of patent ambiguities in the Plan or disputes which affect the operation of the Plan as between the interested parties. If, as here, no such ambiguities are discovered, and the operation of the Plan as written is not affected, we lack jurisdiction to hear new facts or evidence regarding the interpretation of the provisions of the plan.

Finding no patent ambiguities in the Plan and, therefore, lacking jurisdiction to hear the matters raised by the Plaintiffs in the

Complaint, we conclude that the Complaint is dismissed without prejudice. We again emphasize that such a disposition is not a decision on the merits and that the Plaintiffs may well be able to maintain their causes of action against Stone and possibly the Trustee in another forum.[3]

## D. CONCLUSION

An Order dismissing this proceeding for lack of subject-matter jurisdiction, without prejudice as to any issues related to its merits, will accordingly be entered.

---

**3.** The result here is consistent with the implicit holding of the majority in *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), that a non-bankruptcy court is the appropriate forum to hear post-confirmation disputes which do not challenge confirmation of the Plan. This result is logical because, as the Defendants, in making their § 12(b)(6) motion, observe, a bankruptcy court is confined by 11 U.S.C. § 1144 to hearing direct attacks to confirmation "if and only if" confirmation was procured by fraud, and even then only if the attack is levelled within 180 days after the order for confirmation is entered. *See, e.g., In re Crown Globe, Inc.,* 107 B.R. 60, 61 (Bankr.E.D.Pa.1989).

It is logical to assume that remedies for frauds which are perpetuated in obtaining the entry of an order of confirmation can be pursued in some forum even after the 180–day period. However, the remedy of revoking a confirmation order, which would appear to be confined to the bankruptcy court forum, is foreclosed after the 180–day period runs. The forum in which to pursue remedies other than revocation of confirmation would, in our view, not ordinarily be the bankruptcy curt.

Here, of course, the Plaintiffs would, in any event, appear to allege no fraud which would justify revoking the confirmation order. In fact, the Affidavits of Persio and Fischer, see pages 178–79 *supra,* might be said to indicate that they were parties to the fraud of obtaining approval of a Disclosure Statement and Confirmation of a Plan which contained material inaccuracies.