**In re CENTURY INVESTMENT FUND VIII LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 88–05127–MDM.**

United States Bankruptcy Court, E.D. Wisconsin.

May 31, 1990.

---

Albert Solochek, Milwaukee, Wis., for First Bank.

Paul G. Swanson, Oshkosh, Wis., for debtor.

## AMENDED DECISION

M. DEE McGARITY, Bankruptcy Judge.

This case is before the court on motions by the secured creditor for relief after confirmation of a Chapter 11 plan or, alternatively, for dismissal of the Chapter 11 case. This is a core proceeding under 28 U.S.C. § 157(b)(2). The debtor requested relief pending appeal by the creditor. After reviewing the evidence, this court is satisfied that the creditor is entitled to relief, but not dismissal. The court will order the debtor to comply with the plan by a date certain; failing to do so will result in grounds for the dismissal requested by the creditor. The debtor's request for relief pending appeal is denied.

## BACKGROUND

This case has had an active and interesting history. The subject of the reorganization is an 88 unit apartment complex in DePere, Wisconsin, a suburb of Green Bay. The complex was built between 1971 and 1974 at a cost of $2.7 to $2.8 million. There are four buildings of 22 units each, with a total of 8 studios, 48 one bedroom units and 32 two bedroom units. Underground and above ground parking are provided.

The property was purchased in 1987 by the debtor, a limited partnership formed for that purpose. The sole general partner is Century Capital Group, a general partnership originally consisting of Wayne C. Chaney and J. Peter Jungbacker as general partners. Century Capital Group, Ltd., a corporation, was later formed and became another general partner of Century Capital Group. Jungbacker and Chaney each own 50% of the stock of Century Capital Group, Ltd. There are eighteen limited partners.

Century Management Group, Ltd., another corporation owned by Jungbacker and Chaney, managed the property until recently. The property is now managed by a different corporation owned by former employees of Century Management Group, Ltd.

The purchase of the property was financed in part by a loan from First Bank, N.A., in an original amount of $2.1 million. The mortgage securing the loan was signed on April 3, 1987, effective April 1, 1987. Along with the mortgage, the debtor executed an "Assignment of Leases and Rents" as further security. The bank also took letters of credit totalling $400,000 from some of the limited partners. It eventually drew on the letters of credit to reduce the balance on the loan. Those limited partners have a second mortgage position.

The debtor ceased making payments on the loan after July 1, 1988, thereby going into default on the mortgage. On October 19, 1988, First Bank filed its foreclosure action in Brown County Circuit Court and moved for the appointment of a receiver. The debtor filed its Chapter 11 petition on November 17, 1988, before the receiver could be appointed.

Soon after the case was filed, the bank moved to dismiss the case for having been filed in bad faith. It also moved to lift the automatic stay to allow continuation of its foreclosure and to shorten the exclusive period for the debtor to file a plan. The debtor challenged the bank's perfection of its security interest in the rents. There was a temporary order limiting the debtor's use of rents pending a final decision. After two days of presentation of evidence, oral argument and the submission of briefs, the court denied the bank's motions to dismiss and to shorten the exclusive period to file a plan. In a decision dated March 22, 1989, it found that the bank had perfected its security interest in rents prior to filing.[1] An order was entered consistent with the bank's perfected security interest.

In general, the order provided that the debtor's management company could manage the property, pay necessary expenses (except for management fees), maintain a reserve and make improvements agreed to by the bank. In that same decision the court declined to lift the automatic stay. It found that, for a short period of time, the bank would be adequately protected by a small equity cushion and excess rents it might receive after expenses. The court set a date two months after its order to determine if the bank's protection continued to be adequate.

The March 22, 1989 decision denying lifting of the stay was appealed by the bank, but this was apparently resolved when the debtor agreed to the lifting of the stay in an "Agreed Order" dated May 25, 1989. The debtor agreed not to contest the foreclosure. It would not contest the bank's bid price as long as no deficiency was requested, and the bank could request a three month redemption period. The debtor was to remain in possession until the completion of the foreclosure process, and during that period it would comply with the March 22 decision. Finally, the debtor was to file a plan of reorganization by June 1, 1989, in which case the bank could not apply for its judgment of foreclosure until after June 10, 1989. If no plan was filed, the bank could apply for judgment after June 1, 1989.

The debtor did file its plan and disclosure statement on June 1, 1989. These were later modified by the amended plan and disclosure statement dated July 17, 1989, and filed July 19, 1989. The bank objected because the plan called for reinstatement of the mortgage, a provision that the bank argued was nonconfirmable. If a plan is on its face nonconfirmable as a matter of law, then it is appropriate for the court not to approve the disclosure statement. *In re Spanish Lake Associates*, 92 B.R. 875, 877 (Bankr.E.D.Mo.1988); *In re Pecht*, 57 B.R. 137, 139 (Bankr.E.D.Va. 1986). More briefs ensued. The bank

---

**1.** This determination was reversed by the District Court, Case #89–C–380, decided April 26, 1990.

maintained that any plan confirmed after the stay was lifted must comply with Wis. Stat. § 846.13, which delineates the rights of a mortgagor after judgment of foreclosure under Wisconsin law. Under that section, the mortgagor must pay the full amount due in order to redeem.[2] The debtor's rights in property are determined under state law under *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the argument went, and the plan could not modify the provision requiring full payment to redeem the debtor's property interest. The bank also argued that allowing treatment of a secured creditor as the debtor proposed would be contrary to public policy in that it would create uncertainty in secured lenders who have had the stay lifted and have proceeded to enforce their rights in the property under state law in reliance on such an order. Confirming a plan under these circumstances would make the lift stay order meaningless. Finally, it was suggested that confirming such a plan would have the practical effect of vacating the court's previous order, and the debtor should be required to show a change in circumstances justifying what amounted to a reimposition of the stay (actually, modification of the creditor's rights so it had no right to foreclose as long as the debtor complies with the plan).

■ The court overruled the bank's objection. It distinguished Wisconsin law from other states applicable to cases cited by the bank. *See In re Monroe Park*, 18 B.R. 790 (Bankr.D.Del.1982); *In re DeMers*, 89 B.R. 48 (D.S.D.1987); *In re East Lansing 30 Associates*, 47 B.R. 593 (Bankr.W.D.Mich.1985). In *Monroe Park*, Delaware law provided that the judgment of foreclosure merged with the mortgage, thereby changing the debtor's property in-

terest under state law. This could not later be modified or expanded by a plan. In both *DeMers* and *East Lansing*, a sheriff's sale had taken place, and it appears that in those states ownership vested in the purchaser subject to redemption within a specified time by the mortgagor. *See* 11 U.S.C. § 108(b). In *East Lansing*, the term of the mortgage had expired, and there was no mortgage to reinstate. These cases are in contrast to Wisconsin law, which provides that the parties' ownership interests do not change when judgment of foreclosure is entered. *Matter of Madison Hotel Associates*, 749 F.2d 410, 422–24 (7th Cir.1984). The creditor continues to have merely a lien. *Id.* at 422 (cites omitted).

Furthermore, this court doubted that the derailment of a lift stay order by a subsequent plan would have the dire consequences envisioned by the bank. Any affected creditor is protected by the requirements for confirming a plan. Obviously circumstances must have changed if at one time the creditor is entitled to have the stay lifted, and later the debtor is able to meet the requirements of 11 U.S.C. § 1129. *See also* 11 U.S.C. § 362(d). A separate criterion need not be added to 11 U.S.C. § 1129 for debtors that have had the stay lifted during the pendency of the case.

Finally, the court could discern no policy reason for treating one debtor, for whom the stay was lifted to allow entry of a foreclosure judgment, differently from another debtor that had the foreclosure judgment entered before filing and then filed a confirmable plan without an intervening lift stay order. The property interests of both debtors would be the same, and the plan provisions could be the same.

The disclosure statement was approved by order dated August 7, 1989. Then came

---

2. **Redemption from and satisfaction of judgment.** The mortgagor, his heirs, personal representatives or assigns may redeem the mortgaged premises at any time before the sale by paying to the clerk of the court in which the judgment was rendered, or to the plaintiff, or any assignee thereof, the amount of such judgment, interest thereon and costs, and any costs subsequent to such judgment, and any taxes paid by the plaintiff subsequent to the judgment upon the mortgaged premises, with interest thereon from the date of payment, at the same rate. On payment to such clerk or on filing the receipt of the plaintiff or his assigns for such payments in the office of said clerk he shall thereupon discharge such judgment, and a certificate of such discharge, duly recorded in the office of the register of deeds, shall discharge such mortgage of record to the extent of the sum so paid.
Wis.Stat. § 846.13

the hearing on confirmation of the plan. Predictably, the bank objected to its treatment under the plan. It continued to insist that it was entitled to full payment under the redemption provisions of Wisconsin foreclosure law. The plan, on the other hand, called for retention of its lien and monthly payments of interest only at the lower of the market rate or contractual rate provided in the mortgage note. The obligation would be due and payable 36 months from the date of confirmation or upon sale, whichever occurred first. The debtor contemplated sale of the apartment complex after deferred maintenance was corrected and certain improvements were made. The bank also argued that limited partners who agreed to loan the debtor $100,000 were insiders and their votes in favor of the plan could not be counted in determining whether the "cram down" provisions of 11 U.S.C. § 1129(b) can be applied. *See* 11 U.S.C. § 1129(a)(10). These new lenders were the only impaired class to approve the plan. The bank also believed it would not receive the present value of its secured claim, and the plan was not feasible. 11 U.S.C. § 1129(b)(2)(A)(i)(II); (a)(11).

Two more days of testimony, plus oral argument, followed on September 15, 18, and 26, 1989. Most of the evidence related to the income potential of the property, needed repairs and market rates of interest. Meanwhile, the foreclosure sale was set. The court refused to enjoin the sale without a determination that the plan could be confirmed as this would be inconsistent with its prior ruling on the effect of foreclosure on the property rights of the parties. *See Matter of Madison Hotel Associates, supra,* at 422, *citing Glover v. Marine Bank of Beaver Dam,* 117 Wis.2d 684, 697, 345 N.W.2d 449, 455 (1984). If only the confirmation of the sale would change the property rights of the parties, there was no reason to reimpose the stay.

The hearing on confirmation of the foreclosure sale to First Bank for the amount of its loan was set for October 9, 1989, in state court. On October 6, 1989, this court entered its order confirming the debtors plan and enjoining the bank from proceeding to confirm the sale. We found that the individuals loaning the debtor $100,000 for repairs and reserves were not insiders under 11 U.S.C. § 101(30), notwithstanding the fact that they were also limited partners. Limited partners are not included in the definition of insiders, and these loans were not made by the individuals in their capacity as limited partners. Since this class of creditors voted for the plan, the plan met all of the criteria under 11 U.S.C. § 1129(a), except (a)(8), the necessary prerequisites for cramdown. The court found that the bank's treatment, including the interest rate, was fair and equitable, and it would receive the present value of its secured claim. The property was found to be valued at $1,965,000, as is. Needed repairs would total about $64,500. The bank's officer had testified that it was currently owed $1,851,383.81, and this was used to determine its interest in the property. Although the disclosure statement had stated that approximately $105,000 in real estate taxes were owed, the court was persuaded that with the new loan for repairs, rents could be raised to market rates, operating income would increase with a resulting increase in the value of the property. The bank would have sufficient equity protection during the time necessary to make repairs and properly market the property.

The bank simultaneously filed a motion for reconsideration and a notice of appeal. The grounds given for reconsideration were that this court had mistakenly undervalued the amount of the bank's claim. The amount used by the court was the amount testified to by the bank's officer. By its motion the bank wished the court to add some $60,000 in attorney's fees for which there had been no testimony at trial. The court declined to reconsider the matter, the rehabilitation of evidence presented at trial being an inappropriate use of a rule 60(b) motion, and the additional amount of the claim probably would not have changed the result. We presume the appeal proceeded apace.

## CURRENT CONTROVERSY

One might think that the war had moved to the District Court's battlefield. But, no.

The bank was back in the Bankruptcy Court on January 18, 1990, with a motion for "protective order," with a list of 24 demands ranging from mild housekeeping provisions ("15. The debtor shall provide monthly reports concerning repairs to the property on forms acceptable to both parties.") to provisions already required ("11. All of the terms and provisos of all documents executed by the debtor in favor of First Bank, N.A., including, but not limited to, default provisions, except for a maturity date, shall remain in full force and effect including the default provisions as modified by the Plan."—*See* p. 2 of Decision and p. 6 of Plan) to moderately oppressive supervisory authority ("24. The Bank may inspect any tenant applications on file at the office of the project at any time that it wants.") all the way to changing the plan ("6. That the debtor disclose to First Bank, N.A. how the $25,000.00 reserve is used for deferred maintenance and provide that those funds only be used for deferred maintenance. Further, the debtor shall disclose when amounts are used of the $25,000.00 reserve for deferred maintenance. · The $25,000.00 reserve shall only be used "for the operation of the business" not for cash flow purposes." The plan provided for using $25,000.00 as a cash flow cushion). The debtor agreed to many of the less onerous provisions at a preliminary hearing, and the matter was set for a hearing on the merits.

Thereafter, the bank filed its amended motion for protective order and a motion to dismiss. The debtor countered with a motion for relief pending appeal.

The precipitating events bringing about this latest flurry of activity were the debtor's failure to obtain the $100,000 loans from the limited partners and failure to pay post petition real estate taxes, which continue to accrue at the rate of about $6,500 per month. Also, occupancy rates are down, probably as a result of rent increases, although net operating income is up, probably for the same reason. Many repairs have been made out of operating income, but many more are still necessary. The bank believes that the combination of lack of repairs and nonpayment of real estate taxes means that the collateral is deteriorating and it will be impossible for the debtor to realize enough out of the property to cover its loan. Therefore, it wants the court to compel the debtor to take appropriate action to protect the value of the collateral or to dismiss the case so the bank can continue its foreclosure.

On the other hand, the debtor argues that the individuals who had committed to make loans cannot reasonably be expected to do so in light of the appeal of the order of confirmation. If the District Court reverses the bankruptcy court, then any money invested in the property will probably be lost. While the lenders understand the general risks of the enterprise, they are not willing to risk the loss of their loans on account of the appeal. Consequently, the debtor asked that the bank be ordered to return the $100,000 to the individual lenders if the bank is successful in its appeal and recovers the property upon foreclosure.

## JURISDICTION

Both sides agreed that this court has jurisdiction. The plan provides that this court retains jurisdiction for the following purposes:

(6) To enforce and administer the provisions of the Plan

. . . . .

(7) To modify any provision of the Plan to the full extent permitted by the Code; reconcile any inconsistency in the Plan of [sic] the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(8) To correct any defect, cure any omission or reconcile any inconsistency in the Plan of [sic] Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

\* \* \* \* \* \*

(11) To enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan.

The bankruptcy court also retains jurisdiction under 11 U.S.C. § 1142(b) to

perform any act necessary to implement the plan. This includes the authority to clarify ambiguities within the plan. *In re Greenley Energy Holdings of Pennsylvania, Inc.,* 110 B.R. 173 (Bankr.E.D.Pa. 1990).

■ The debtor argued that it is not required to raise the $100,000 for repairs and operating reserve because the plan is not yet effective. The plan's definition section states the "Effective Date" shall be the date on which the order confirming the Plan becomes final and nonappealable." Since the case is on appeal, the debtor argues that it does not yet have to comply with the plan. This flies in the face of the general rule that orders are final when made and continue to be enforceable until reversed on appeal or until relief pending appeal is granted pursuant to Bankruptcy Rule 8005. To the extent that the definition of "effective date" creates an ambiguity in the plan, this court construes the plan to be effective on October 6, 1989, the date when the court signed the order of confirmation.

## CREDITOR'S MOTION FOR RELIEF

The bank brought in an architect who had examined the property, including all 88 units, and who came with tales of rot and ruin. He said it would take approximately $480,000 to repair the property to the point that it would be saleable. Of particular concern is the underground parking structure. At the time of the confirmation and after conflicting testimony, this court had determined that the structure could be repaired and the cracks sealed instead of removing the upper parking deck, installing a waterproof membrane and replacing the surface. The debtor had repairs done in the fall of 1989, but the structure still dripped a corrosive substance (caused by dissolving concrete as water seeped through the cracks) on the cars below. While the debtor argued that only one half of the $14,000 repair cost had been paid pending final repairs by the contractor pursuant to its guarantee, the bank's expert testified that reconstruction at a cost of $83,400 was necessary. The architect fur-

ther recommended replacing two of the four roofs, replacing all appliances, replacing all hall carpets, replacing all shingles, replacing all windows and sliding patio doors, doing extensive patio and landscape improvements and making structural repairs where water had rotted floors and joists. These could not be problems of recent vintage. Could it be, the court wondered, that all this had occurred before the plan was confirmed and was not brought out at the hearing? Should the plan never have been confirmed on account of the dire condition of the property? Is this an attempt to get around the restrictions on revoking an order of confirmation? 11 U.S.C. § 1144. And was this in reality a motion to reconsider in sheep's clothing, brought now that the bank had an expert who would testify to the property's near hopeless condition? *See* Bankruptcy Rule 9024.

The debtor's architect was considerably more conservative in his assessment of the repairs needed. His recommendations were more along the lines of repairs rather than renovation at a cost more in line with the plan.

Fortunately, both parties suggested that the court take a look. After a tour of the premises, the court was satisfied that the bank's architect was overreacting. As this court stated in *In re Park Avenue Partners Limited Partnership,* 95 B.R. 605, 610 (Bankr.E.D.Wis.1988), a court faced with conflicting experts must evaluate their credibility, the logic of their analyses and the persuasiveness of their subjective reasoning. The place just was not that bad. Repairs to a floor that had water damage appeared to be adequate, and the patio door worked quite well after repair. Clearly no replacement was necessary. A few of the ovens were missing gaskets, but otherwise all of the appliances worked. The tubs in the vacant apartments were newly grouted. A number of minor repairs in the bank's architect's early report had been made. Some of the hall carpet could wait a short time, although all should be replaced in the near future. Only missing shingles and balcony boards need to be

replaced, not all. Even the architect admitted that the two older roofs did not leak, but he thought they should be replaced because they soon might. Many of the repairs could be done by a maintenance person at far less cost than the bank's architect estimated for contractors, and he admitted as much. The debtor's manager plans to bring in extra help this summer for that purpose. Finally, the court was persuaded by the concrete restoration contractor who stated that his firm had not had a chance to test for leaks last fall, but he was certain that they could make the structure leakproof, and they stand by their guarantee.

 The court is satisfied that the initial finding of feasibility of the plan and the condition of the property was correct, but it was a close call even then. The decision states "that if interest and real estate taxes are kept current, there will be sufficient value in the property to pay First Bank in full upon sale." (Decision p. 9). That determination was also grounded upon the investment of the $100,000 in the property by the way of loans from limited partners. While the property is well designed and generally attractive, there is too much that needs to be done to rely solely on operating revenue. If those loans are not made, either the maintenance will not be done or the real estate taxes will not be paid. This has happened already. The property cannot wait for the appeal process to run its course. If the contemplated repairs are not made, the debtor cannot effectuate its plan, and the case may be subject to dismissal. 11 U.S.C. § 1112(b)(7), (8).

It follows then that the bank is entitled to relief in order to enforce the confirmed plan. 11 U.S.C. § 1142(b). *In re Greenley Energy Holdings of Pennsylvania, Inc.,* 110 B.R. 173 (Bankr.E.D.Pa.1990); *In re Cinderella Clothing Industries, Inc.,* 93 B.R. 373 (Bankr.E.D.Pa.1988); *Matter of Coral Air, Inc.,* 40 B.R. 979 (D.V.I.1984). Immediate enforcement of the plan is necessary to protect the value of the bank's collateral. Therefore, the court will order that the debtor obtain $100,000 in loans as contemplated by the plan within 30 days

from the date of this decision and the order entered in conjunction with this decision. If it fails to do so, the bank may renew its motion to dismiss. In the meantime, the *motion to dismiss will be adjourned and will be denied if the debtor obtains its contemplated financing.*

### DEBTOR'S MOTION FOR RELIEF PENDING APPEAL

 For the reasons outlined above, the debtor cannot postpone obtaining financing for repairs as is required by the plan. Its request for an order requiring the bank to return the $100,000 if the confirmation is overturned on appeal is likewise unfair and impractical. The cash must be put into the property. If the bank were required to pay $100,000 to the new lenders if it acquires the property in foreclosure, this would have the effect of increasing the bank's loan by $100,000. There is no guarantee of the bank's recovering that amount on resale. The bank is already an involuntary creditor. To increase its debt exposure would not be fair. The debtor's motion for relief will be denied.

This constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

An order consistent with this decision was entered.