**In re Fred Lawrence SILBERKRAUS,
Debtor.**

**No. LA 00–13852–KM.**

United States Bankruptcy Court,
C.D. California.

Oct. 12, 2000.

Thomas W. Dressler, Dressler Rein Evans & Sestanovich, LLP, Los Angeles, CA, for Debtor.

Abraham M. Rudy, Weissmann, Wolff, Bergman, Coleman & Silverman, LLP, Beverly Hills, CA, Joseph A. Eisenberg, P.C., Michael I. Gottfried, Jeffer, Mangels, Butler & Marmaro, LLP, Los Angeles, CA, for Creditor, L.E. Coppersmith, Inc.

G. Thomas Flemming, Kevin K. Fitzgerald, Jones, Bell, Abbott, Flemming & Fitzger, Los Angeles, CA, for Creditor, The Seeley Company.

Les Glenn Hardie, Santa Monica, CA, Les Glenn Hardie, Calabasas, CA, for Jeannie Silberkraus.

## I. Facts

KATHLEEN P. MARCH, Bankruptcy Judge.

### A. Filing of Chapter 11, State Court Litigation, Conduct in Chapter 11

#### 1. Debtor's Bankruptcy Petition

On February 8, 2000, Fred Lawrence Silberkraus ("Debtor"), an individual, filed a voluntary chapter 11 petition. As of date of filing Debtor owned two major assets, as shown by his bankruptcy schedules. These were a 75,000 foot industrial building located at 2501 Santa Fe Avenue, Redondo Beach, CA 90278 (the "commercial property") and Debtor's personal residence located at 1340 Roscomare Road, Los Angeles, CA 90077 (the "residence").

The fair market value of the commercial property as of date of filing was between

$6,000,000 and $7,000,000 per Debtor's Schedules and Debtor's disclosure statement filed June 7, 2000. Pursuant to Debtor's Schedule D, the liens on the commercial property totaled $2,917,420.40. Therefore, the commercial property had equity in the amount of $3,082,796.60.

According to Debtor's Schedules, the fair market value of the residence as of date of filing was $775,000. Schedule D showed liens on the residence totaling $602,000. Debtor claimed a $75,000 homestead exemption on Schedule C. Consequently, the equity above liens after paying the Debtor the exemption amount would be $98,000, minus costs of sale.

Debtor's Schedule E showed no unsecured priority claims. Schedule F showed general unsecured claims in the amount of $510,592. All but $121,092 of this unsecured debt was listed as disputed. A total of $303,000 of the disputed unsecured debt was allegedly general unsecured debts owed to L.E. Coppersmith, Inc. (hereinafter "Coppersmith") and The Seeley Company (hereinafter "Seeley"). A total of $131,000 of the scheduled general unsecured debt was incurred in January of 2000—the month prior to the bankruptcy filing. Debtor's testimony at the 341(a) meeting revealed that $10,000 of the credit card debt was incurred for the purpose of paying part of Debtor's attorney's $50,000 pre-petition retainer. (See L.E. Coppersmith's Reply to Opposition to L.E. Coppersmith Inc. Motion for Relief from Stay, Declaration of Michael Gottfried.)

Because Debtor's assets—$3,082,796.60 in equity in the commercial property above all liens, $98,000 of equity in the residence above all liens—exceeded Debtor's remaining liabilities—$510,592 in mainly disputed unsecured claims, Debtor was very solvent on the petition date. In a chapter 7 liquidation, after selling the commercial property and residence for fair market value and paying the claimed homestead exemption in the amount of $75,000, a chapter 7 trustee would be able to pay 100% of all debts owed by Debtor (secured, priority, general unsecured).

As discussed infra, the Debtor—or a chapter 7 trustee if the case was converted to a chapter 7—may be obligated to sell the Debtor's commercial property to creditor Coppersmith. Coppersmith claimed it had an option to purchase the building for $3,950,000, and claimed to have properly exercised this option to purchase prepetition. However, even a sale of the commercial building to Coppersmith at $3,950,000, plus sale of the residence at the fair market value of the residence, should have produced enough money to pay all creditors in this case 100%, or very close thereto, given the Debtor's liabilities as scheduled.

Throughout this bankruptcy case, Debtor responded to the creditors' contention that a sale of the commercial property, even at the $3,950,000 option price, would be sufficient to pay all creditors, by asserting that "enforcing the option to purchase in the manner [Coppersmith and Seeley] ... demand would trigger massive tax liabilities.... [W]hen the tax consequences are considered the alleged 'one million dollars' gain on sale to Coppersmith becomes a $151,000 loss." (See Debtor's Opposition to L.E. Coppersmith Motion to Lift Stay, page 2, lines 20 – 22.) Debtor contended that the "original cause of the dispute between Silberkraus and Coppersmith was Coppersmith's inexplicable refusal to honor its obligation to cooperate in arranging a tax-free exchange." (See Debtor's Opposition to L.E. Coppersmith Motion to Lift Stay, page 3, lines 9 – 11.)

However, Debtor never supported its tax liability contentions with competent evidence. Debtor initially provided a sparse analysis purportedly showing potential future capital gains tax liability; but, Debtor provided no foundation for the capital gains analysis, including that Debtor did not even identify who authored the pur-

ported capital gains analysis.[1] (*See* Debtor's Opposition to the L.E. Coppersmith Motion to Lift Stay, Exhibit A.) Later, Debtor offered the Declaration of Herbert D. Sturman to support the Debtor's tax analysis. (*See* Debtor's Opposition to The Seeley Company Motion to Lift Stay, Declaration of Herbert D. Sturman.) But this Declaration was not based on personal knowledge: Sturman stated that he has "not independently verified these matters and cannot therefore opine as to the precise result reached in dollars and cents." *See e.g., Edgewater Walk Apts. v. MONY Life Ins. Co.,* 162 B.R. 490 (N.D.Ill.1993) (stating that opinion evidence is not binding on the fact finder, even if no contradictory evidence is offered by the other side, and fact finder should give it weight only in inverse proportion to the amount of speculation and unfounded assumption that fact finder perceives to form a part of evidence). Finally, the uncontradicted declaration of Coppersmith was that Coppersmith was willing to cooperate, and had cooperated, in trying to effect a tax free exchange since April 9, 1999. (*See* Reply to Opposition to L.E. Coppersmith Inc. Motion for Relief from Stay, Declaration of L.E. Coppersmith, ¶ 4.) Moreover, Debtor claimed to be using the bankruptcy to reorganize by selling or leasing the property on the open market, at fair market value, to some party other than Coppersmith. If a sale at $3,950,000 would trigger tax liability, it appears that a sale at a higher figure would create even more tax liability. Yet, selling the property at a higher price is one of the alternatives Debtor was proposing.[2] (*See* Debtor's Disclosure Statement.)

## 2. The State Court Litigation with Coppersmith and Seeley

In 1993 Debtor and Seeley entered into an agreement whereby Seeley became the Debtor's agent for the sale or lease of the commercial property. In December of 1994, Debtor and Coppersmith entered into a written lease which leased the commercial property to Coppersmith for five years, with an option to purchase at the end of the term. The lease provided that Seeley was to be paid a commission upon Coppersmith's exercise of the option to purchase. (*See* Exhibit A to L.E. Coppersmith's Motion for Relief from Stay for a copy of the lease/option to buy contract.)

On April 9, 1999 Coppersmith exercised its option to purchase the commercial building at $3,950,000.[3] (*See* L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith, Exhibit B.) Escrow was opened on April 19, 1999. (*See* L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith, Exhibit C.) Pursuant to the lease, escrow had to close no later than 180 days from the exercise of the option to purchase. Accordingly, escrow was scheduled to close on or before October 18, 1999. (L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith, Exhibit A.) On October 15, 1999— with the closing of escrow just 3 days away—Debtor's transactional counsel, Thomas & Walton LLP, wrote to the escrow company and stated that escrow would not be closing on October 18, 1999 because of the litigation between Debtor and Jeannie Silberkraus (Debtor's former

---

1. The Declaration of Fred Silberkraus contended that this analysis was prepared in consultation with tax advisers. The Declaration provided no other detail regarding this analysis.

2. Debtor's Disclosure Statement proposed two alternatives: (1) reject the Coppersmith lease and refinance the property; or (2) if Coppersmith's damage claim was too high, sell the property on the open market.

3. The lease between Debtor and Coppersmith also contained an option to extend the term of the lease an additional 60 months (from 3/2000 – 3/2005). (L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith, Exhibit A.) Out of caution, Coppersmith exercised the renewal option on June 28, 1999. (L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith, Exhibit D.)

spouse). (*See* L.E. Coppersmith's Motion for Relief from Stay, Declaration of L.E. Coppersmith and Exhibit E thereto.) However, pursuant to a September 15, 1999 Order of Commissioner Erdman, the Commissioner had already ruled in the litigation between Fred Silberkraus and Jeannie Silberkraus that the proceeds of the sale would be held in an interest bearing trust account pending further order from the court. (*See* L.E. Coppersmith's Motion for Relief from Stay, Request for Judicial Notice, Exhibit A.) The letter from Debtor's counsel to the escrow company also alluded to alleged defaults by Coppersmith which would make closing impossible; but a declaration of L.E. Coppersmith attested that Debtor had not found a single occasion of default by Coppersmith during the previous 4½ years of the lease.

On October 20, 1999, Coppersmith filed a complaint in Los Angeles Superior Court, State of California against Debtor and Jeannie Silberkraus, alleging breach of contract, and seeking specific performance to compel the sale of Debtor's commercial property to Coppersmith pursuant to the option to purchase. (*See* L.E. Coppersmith's Motion for Relief from Stay, Request for Judicial Notice, Exhibit B.) On November 19, 1999, Debtor answered the complaint and filed a cross complaint against Coppersmith and Jeannie Silberkraus. (*See* L.E. Coppersmith's Motion for Relief from Stay, Request for Judicial Notice, Exhibit C.)

On December 4, 1998, the Debtor filed a complaint against Seeley in Los Angeles Superior Court. (*See* The Seeley Company Motion for Relief from Stay, Declaration of William Turner.) The Debtor alleged that Seeley committed a breach of contract and a breach of fiduciary duty in connection with the Lease and Listing Agreement. (*See* The Seeley Company Motion for Relief from Stay, Declaration of William Turner.) The Superior Court action was ultimately stayed, and the parties submitted to arbitration. The arbitration hearings were scheduled to be conducted from February 7, 2000 to February 10, 2000. On January 3, 2000, by stipulation of the parties, Seeley filed a complaint in intervention in the Coppersmith v. Debtor Superior Court action. The Superior Court ordered the arbitration stayed pending the resolution of the Superior Court action initiated by Coppersmith. (*See* The Seeley Company Motion for Relief from Stay, Declaration of William Turner.)

The Superior Court scheduled a status conference for February 10, 2000, for the purpose of scheduling trial dates on Coppersmith's complaint, Debtor's cross complaint and Seeley's complaint in intervention. (*See* L.E. Coppersmith, Inc.'s Motion for Relief from Stay, Declaration of Abraham Rudy.)

However, on February 8, 2000—two days before the scheduled state court status conference—Debtor filed the herein bankruptcy, thereby staying the state court action. Throughout the bankruptcy, Debtor has been represented by Dressler Rein Evans & Sestanovich, LLP (hereinafter "the Dressler law firm"). Attorney Thomas Dressler, Esq. (hereinafter "Dressler, Esq.") of that firm was the attorney who signed the bankruptcy petition, and who signed all other pleadings filed on behalf of Debtor in the bankruptcy, as the attorney from the Dressler law firm.

### 3. Debtor's Conduct During the Chapter 11 Case

#### a. Opposing The Relief from Stay Motions

Coppersmith, and then Seeley, each filed motions for relief from stay in this bankruptcy case, moving the Court to lift the automatic stay of 11 U.S.C. § 362 so that Coppersmith and Seeley could proceed to judgment in the Superior Court specific performance and breach of contract action by Coppersmith against Debtor, in which Seeley had intervened. Coppersmith and Seeley each argued in their respective motions for relief from stay that cause existed

to grant relief from stay, pursuant to 11 U.S.C. § 362(d)(1), based on Debtor's bad faith. Debtor aggressively opposed both motions for relief from stay by voluminous written Oppositions, signed by Dressler, Esq. on behalf of the Dressler law firm. At the hearing on the relief from stay motions, Dressler, Esq. appeared and argued emphatically against granting relief from stay. After hearing extensive argument on the Coppersmith relief from stay motion, the Court granted Coppersmith relief from stay to go to judgment plus appeal in the state court, and also relief from stay so that any injunctive or declaratory relief ordered by the state court, such as specific performance, would not by stayed from being enforced. The Court ruled that the stay would remain in effect in so far as enforcing any money judgment against the Debtor, other than by filing a claim in the bankruptcy case for a monetary judgment amount. In granting relief from stay, the Court ruled that the pivotal issue in Coppersmith's specific performance action—i.e., whether or not Coppersmith has a valid and enforceable option to purchase Debtor's commercial property at $3,950,000 is a state law contract issue; and ruled that the state court is the most appropriate forum to determine such state law issues. *See e.g., In re Castlerock Properties,* 781 F.2d 159 (9th Cir.1986). When the Seeley relief from stay motion appeared on calendar, the Court granted the Seeley relief from stay motion on the same terms as the Coppersmith relief from stay order.

The Court noted in granting the relief from stay motions that it is inappropriate to allow the Debtor to forum shop—to seek to have the bankruptcy court determine the validity of the option to purchase, instead of the state court—via the mechanism of filing bankruptcy. The state court lawsuit—which would have decided that issue—was already in progress at the time the bankruptcy was filed. Bankruptcy was not necessary to get a determination regarding the validity and enforceability of the option to purchase. If the state court determined that the option to purchase was not enforceable, then the Debtor should be able to propose a chapter 11 plan in the bankruptcy that would sell the commercial property elsewhere, possibly at a higher price than the option price. If the state court granted specific performance to Coppersmith, then the Debtor would not have the commercial property to sell, but Debtor would have the $3,950,000 purchase price (minus paying liens, costs of suit, etc.) to distribute via a chapter 11 plan.

**b. Chapter 11 Status Conference and Disclosure Statement Hearing**

At a Chapter 11 status conference held by the court on May 10, 2000 the Court set "drop dead dates" for the Debtor to file a plan and disclosure statement (August 8, 2000), for the Debtor to have a disclosure statement approved by the court as containing adequate information pursuant to 11 U.S.C. § 1125 (October 6, 2000), and for Debtor to have a chapter 11 plan confirmed (December 8, 2000). (*See* Order Setting Dates Certain On Court's Order Re Status Conference entered May 15, 2000.) Debtor did not oppose these dates.

On June 7, 2000 Debtor filed a plan and disclosure statement. A hearing was held on the disclosure statement on July 18, 2000. Written objections to the disclosure statement were filed by four parties—the Office of the U.S. Trustee, Coppersmith, Seeley, and Jeannie Silberkraus. Coppersmith objected to the Plan as being predicated upon the assumption that Debtor could reject the lease and option to purchase, refinance the commercial property and re-lease the property at the "market rate," or sell it, thereby ignoring: (1) the fact that the Court had granted relief from stay on the state court specific performance action, and Coppersmith might win that action for specific performance, and (2) the fact that Debtor's premise that Debtor could use bankruptcy to get rid of Coppersmith's lease and option to pur-

chase, and thereby could obtain a net increase in value from the commercial property, was contrary to both the Bankruptcy Code and controlling Ninth Circuit case law. Seeley joined in Coppersmith's objections.

Ex-spouse and creditor Jeannie Silberkraus objected to the disclosure statement on the ground that the plan's proposed treatment of Jeannie Silberkraus was unfair and improper because it purportedly delayed the receipt of approximately $420,000 in secured funds owed by Debtor to Jeannie Silberkraus per the prepetition state court property division decree. Jeannie Silberkraus alleged that a family court arbitrator already rejected the proposal set forth by Debtor, and that the proposal would result in Jeannie Silberkraus never receiving the principal she was owed during her lifetime.

The Office of the U.S. Trustee's objection pointed out myriad defects in the proposed disclosure statement and plan, including: that Debtor did not disclose the terms of the note awarded to Jeannie Silberkraus in the arbitration of their divorce proceedings, and until (and if and when) the property is refinanced, monthly payment terms to Jeannie Silberkraus should be provided; that Debtor failed to state what cash would be available on the Effective Date; that Debtor failed to provide any details regarding the refinancing of the property; and that Debtor completely failed to submit historical or projected financial statements.

After a lengthy hearing the Court denied approval of the disclosure statement for numerous reasons, including that the plan was nonconfirmable on its face because of improper classification, particularly splitting Coppersmith's and Seeley's unsecured claims into a separate unsecured class from the other general unsecured claims. The Court ruled, inter alia, that separate classification of Coppersmith and Seeley was improper pursuant to *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991), *cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992) as adopted by the Ninth Circuit in *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520 (9th Cir.1996), *cert. denied*, 520 U.S. 1143, 117 S.Ct. 1312, 137 L.Ed.2d 475 (1997), because the separate classification was done to gerrymander to create an impaired class (the non-Coppersmith/Seeley general unsecured class) which might vote to accept the plan. The Court ruled it would be a waste of resources to approve any disclosure statement, unless the classification of the underlying plan was corrected, because the improper classification would render the plan nonconfirmable. There are numerous decisions which hold that where a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan. *In re United States Brass Corp.*, 194 B.R. 420 (Bankr.E.D.Tex.1996); *In re Spanish Lake Assoc.*, 92 B.R. 875, 877 (Bankr. E.D.Mo.1988); *In re Pecht*, 57 B.R. 137, 139 (Bankr.E.D.Va.1986); *In re Century Investment Fund VIII Ltd. Partnership*, 114 B.R. 1003 (Bankr.E.D.Wis.1990).

At the disclosure statement hearing on July 18, 2000, creditors Coppersmith and Seeley urged the court to convert or dismiss this case due to the myriad problems with the plan and disclosure statement. Dressler, Esq. told the Court that the Debtor would amend the plan and disclosure statement to fix these problems, and asked for a continuance to file an amended plan and disclosure statement. The Court overruled the creditors' objections to the requested continuance. The Court gave Debtor until August 8, 2000 to file a first amended disclosure statement and plan, gave creditors until August 22, 2000 to object to the first amended disclosure statement, and set a hearing on the first amended plan and disclosure statement for September 5, 2000. The Court directed Debtor to amend the plan to fix the classification, with corresponding changes in the amended disclosure statement, and direct-

ed Debtor to also clearly show the net amount that the Debtor would receive if Coppersmith prevailed in the state court specific performance action. The court also directed Debtor to fix several additional problems with the disclosure statement and plan: the liquidation analysis in the disclosure statement showed that creditors would receive more in a chapter 7 than in a chapter 11 so either there was an error in the liquidation analysis or the plan would have to be amended to pay more to the creditors to meet the 11 U.S.C. § 1129(a)(7) test; the Class 4 interest holders (Debtor) was listed as impaired and should have been listed as unimpaired; the disclosure statement did not disclose the arbitration order regarding the Jeannie Silberkraus note; the disclosure statement was not clear with respect to its treatment of secured claims; the disclosure statement did not adequately describe the risks under the plan; the disclosure statement did not provide any detail regarding the financing efforts and lacked financials; and the disclosure statement did not include an exhibit showing the unsecured claims which made up the general unsecured class.

### c. The Motion to Convert from Chapter 11 to 7

Creditor Coppersmith moved the Court to convert the case from a chapter 11 to a chapter 7 due to Debtor's bad faith pursuant to 11 U.S.C. § 1112(b). Alternatively, Coppersmith's motion sought the appointment of a chapter 11 trustee for cause pursuant to 11 U.S.C. § 1104(a). Seeley joined in this motion. The motion to convert was first set for hearing on July 18, 2000, the same day as the original disclosure statement hearing.

Section 1112(b) provides that "the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interests of the creditors and the estate, for cause . . . ." Coppersmith alleged that the Debtor filed his

chapter 11 case in bad faith, for the purpose of impeding the state court action, and to forum shop, citing *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825 (9th Cir.1994); *Y.J. Sons & Co. v. Anemone, Inc. (In re Y.J. Sons & Co., Inc.)*, 212 B.R. 793 (D.N.J.1997); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988).

Coppersmith contended that the timing of the petition (just two days prior to a trial setting status conference in state court) coupled with the fact that the Debtor was solvent on the petition date, established Debtor's bad faith. Coppersmith further stated that cause for conversion existed because the Debtor failed to act as a fiduciary to his creditors because: (1) the dispute with Coppersmith caused a conflict of interest (Debtor could pay all creditors even if Coppersmith exercised the option); (2) the Debtor incurred $50,000 of credit card debt just prior to filing for the purpose of paying the bankruptcy retainer; (3) Debtor made selective prepayments for services not yet rendered just prior to filing; (4) Debtor would fail to properly pursue avoidance actions; (5) Debtor used cash collateral to pay personal expenses and without approval of the court; and (6) Debtor used the services of special litigation counsel without prior court approval. Finally, Coppersmith alleged that cause for conversion existed because Debtor proposed an unconfirmable plan of reorganization, which failed to reveal the "insurmountable obstacles which the Debtor face[d] in obtaining *any* proceeds from refinancing the Redondo Beach Property [the commercial property]." (*See* L.E. Coppersmith's Motion to Convert, p. 21, line 7 – 10.)

When the Court ruled that it would give Debtor until August 8, 2000 to file an amended plan and disclosure statement, and set a hearing on the adequacy of the first amended disclosure statement for September 5, 2000, the Court continued Coppersmith's motion to convert to September 5, 2000 also, to see whether or not Debtor could get a disclosure statement approved on the continued date. Also at the hearing on July 18, 2000, the court *sua*

*sponte* issued an Order to Show Cause Why Debtor's case should not be dismissed, with a one hundred and eighty day prohibition against any subsequent refiling, for lack of progress. The Court set this Order to Show Cause hearing on September 5, 2000, the same date as the hearing date on the yet to be filed first amended disclosure statement and plan, and the continued hearing date on Coppersmith's motion to convert Debtor's case from chapter 11 to chapter 7. The Court scheduled all three hearings for the same date so that Court would have widest possible range of options available on the continued date—approve a first amended disclosure statement if one was filed and complied with 11 U.S.C. § 1125, convert the chapter 11 case to chapter 7, or dismiss the case with a 180 day bar.

### d. No First Amended Plan and Disclosure Statement Filed, and Debtor Concedes It Cannot Reorganize

The deadline for Debtor to file its first amended disclosure statement and first amended plan came and went without Debtor filing either a first amended disclosure statement or a first amended plan. On the September 5, 2000 continued hearing date, Dressler, Esq. confirmed that Debtor had not filed either an amended disclosure statement or an amended plan. Dressler, Esq. also conceded at the September 5, 2000 hearing that Debtor **could not reorganize** over the objection of creditors Coppersmith and Seeley, and that Debtor did not, as of the September 5, 2000 hearing date, have the consent/cooperation of these objecting creditors.

Dressler, Esq. advised the Court that the Debtor would consent to dismissal with 180 day bar. The Office of the U.S. Trustee requested conversion to a chapter 7, stating there was sufficient available equity to pay all or a substantial portion of the total debt in a chapter 7 liquidation, even if the state court were to rule that Coppersmith had an enforceable option to purchase at $3,950,000, and because there was $121,092 of undisputed general unsecured debt (in addition to the disputed general

unsecured claims of Coppersmith and Seeley), which would be better served by payment in chapter 7 than by dismissal with no condition of payment. Seeley stated that it preferred having the court dismiss the case and impose sanctions pursuant to F.R.B.P. Rule 9011. Coppersmith said its first choice was dismissal with sanctions rather than conversion. Jeannie Silberkraus requested conversion of the case to a chapter 7.

The Court converted the case to chapter 7, because there was sufficient equity to pay all or substantially all debt in a chapter 7 liquidation, even if the Coppersmith option to purchase was enforceable. Furthermore, even though Seeley and Coppersmith would be protected by proceeding in the state court suit if the bankruptcy case was dismissed with a bar, the general unsecured credit card debt and the debt owed to ex-spouse Jeannie Silberkraus would not be protected; and would be unlikely to be paid if the bankruptcy case was dismissed rather than converted.

By the date of the conversion, Debtor had had the protection of the bankruptcy court for seven months, successfully delaying his creditors for that period of time. Converting the case to chapter 7 would give the creditors some benefit from the bankruptcy case, because a chapter 7 trustee would be appointed and could be expected to liquidate both the commercial property and the residence, whereas the Debtor, as a Debtor-in-Possession, never proposed selling his own residence. Additionally, a neutral party such as a chapter 7 trustee might settle the Coppersmith/Seeley state court litigation for an amount sufficient to pay the creditors, whereas the Debtor had no incentive to settle unless the price was high enough to pay all creditors plus return funds to the Debtor.

### e. L.E. Coppersmith's Motion for Sanctions and Seeley's Motion for Sanctions

After the deadline for the Debtor to file an amended plan and disclosure statement

passed with none being filed, Coppersmith and Seeley each filed motions moving the court to sanction Debtor, Dressler, Esq. and the Dressler law firm, pursuant to F.R.B.P. Rule 9011 and 11 U.S.C. § 105. Coppersmith moved the Court to sanction these three respondents $97,429.67, representing the attorney fees that Coppersmith had incurred to defend against the chapter 11 case up to the date the motion for sanctions was filed. Seeley moved for sanctions of $17,964.00 against the same three respondents, representing the fees Seeley had incurred to defend against the chapter 11 case up to the date the motion for sanctions was filed.

Coppersmith and Seeley also each applied to have these motions heard on shortened time—so that the sanctions motions could be heard at the same time as the continued disclosure statement hearing, the motion to convert, and the Court's order to show cause why Debtor's case should not be dismissed with a 180 day bar against refiling. In light of the fact that Debtor failed to file an amended plan and disclosure statement, and that Dressler, Esq. responded to the Court's Order to Show Cause by stating that the Debtor would not be opposing a dismissal, the Court granted the applications to have the sanctions motions heard at the September 5, 2000 hearing, so that the issue of sanctions would not be mooted by dismissal of the case, in the event that the Court granted dismissal of the case. As discussed in detail infra in **Section II.B,** the Court granted the motions for sanctions at the hearing on September 5, 2000, but only in one half of the amounts moved for by Coppersmith and Seeley.

### II. Applicable Law

### A. Pursuant to the "Totality of Facts and Circumstances" Case Law Test for Bad Faith, Debtor Filed and Prosecuted its Chapter 11 Bankruptcy in Bad Faith

■ Findings of lack of good faith in proceedings depends on the totality of the facts and circumstances surrounding the particular case, or as stated in *In re Little Creek Dev't Co.,* 779 F.2d 1068, 1072 (5th Cir.1986), "on a conglomerate of factors rather than on any single datum." *Accord, In re Can–Alta Properties, Ltd.,* 87 B.R. 89, 91 (9th Cir. BAP 1988). *See also, Marsch v. Marsch (In re Marsch),* 36 F.3d 825 (9th Cir.1994); *In re Arnold,* 806 F.2d 937 (9th Cir.1986); *Chu v. Syntron Bioresearch, Inc. (In re Chu),* 253 B.R. 92 (S.D.Cal.2000); *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984). All the facts and circumstances leading up to the filing of the case, and the conduct of the Debtor during the case, can properly be considered by the Court in determining whether the chapter 11 case was subject to dismissal or conversion "for cause" for bad faith/lack of the "good faith" by the debtor that is required pursuant to 11 U.S.C. § 1129(a)(3) for the court to be able to confirm a chapter 11 plan. *Id.; see also, In re Charfoos,* 979 F.2d 390 (6th Cir. 1992); *Laguna Assoc. Ltd. Partnership v. Aetna Casualty & Surety Co. (In re Laguna Assoc. Ltd. Partnership),* 30 F.3d 734 (6th Cir.1994). A chapter 11 debtor has the burden of proving this "good faith" element is met, as well as the burden of proving all of the other elements governing plan confirmation. *Leavitt v. Soto (In re Leavitt),* 209 B.R. 935, 940 (9th Cir. BAP 1997), *aff'd,* 171 F.3d 1219 (9th Cir. 1999).

■ In light of the facts and circumstances detailed in **Part I** supra herein, Debtor's filing and prosecution of this chapter 11 case was in bad faith. These facts include: (1) Debtor's welching on closing escrow to sell the commercial property to Coppersmith pursuant to the Coppersmith option to purchase, a mere three days before scheduled closing; (2) Debtor's filing bankruptcy—though Debtor was solvent—to obstruct, delay and stay the ongoing pending state court specific performance litigation; (3) Debtor's forum

shopping to try have the bankruptcy court, rather than the state court, determine the validity and enforceability of the option to purchase including Debtor's Opposition to Coppersmith's and Seeley's relief from stay motions; (4) Debtor's failure to file a first amended plan and disclosure statement, after requesting and receiving an extension of time from the court—over the objection of the creditors—to do so; and (5) Debtor's admission, at the hearing held September 5, 2000, that Debtor could not reorganize over the objections of Coppersmith and Seeley. Additionally, as discussed in **Part II.A.2 – 7** infra (1) applicable case law in the 9th Circuit does not allow bankruptcy to be filed to defeat Coppersmith's right to specific performance if Coppersmith's option to purchase was valid and enforceable under state law; and (2) even assuming arguendo that Debtor would have been able to use 11 U.S.C. § 365 to reject Coppersmith's option to purchase and the lease, Debtor could probably not have obtained substantially more net value from the commercial property by using Section 365 rejection, from whatever result Debtor could have obtained by litigating in state court.

 It is inappropriate to allow a bad faith chapter 11 to continue. Therefore, on September 5, 2000 the Court was required to convert the case to a chapter 7 or dismiss the chapter 11 case, "whichever is in the best interests of the creditors and the estate, for cause," pursuant to 11 U.S.C. § 1112(b). A bankruptcy court has broad discretion to convert or dismiss a chapter 11 petition for "cause" under 11 U.S.C. § 1112(b). *Pioneer Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortgage Entities)*, 248 B.R. 368, 375 (9th Cir. BAP 2000). In this case, after hearing two hours of oral argument on September 5, 2000 on the question of whether conversion or dismissal was in the best interests of the creditors and the estate, the Court granted conversion to chapter 7 pursuant to 11 U.S.C. § 1112(b), for cause, because conversion to chapter 7

would better protect the creditors and the estate, as well as protecting the integrity of the bankruptcy system.

 The Bankruptcy Code provides certain protections and benefits to creditors, as a counterbalance to the rights and protections which the Bankruptcy Code provides debtors. *See e.g.*, Richard I. Aaron, *Bankruptcy Law Fundamentals*, § 8.03 (2000) ("Distribution to the creditors based upon their allowed claims is the fundamental purpose of bankruptcy. The theory is that the equitable powers of the bankruptcy court are used to fairly distribute the inadequate assets of the insolvent debtor among the general creditors. The equitable theory is that fair sharing is much more desirable than leaving the creditors to the hustle and aggression of the 'race to the courthouse' remedy which award all to the first in time.")

 Chapter 11 bankruptcy is not supposed to be like a "7–11" convenience store, where the debtor merely drops in and picks up that which the debtor wants (here, obstruction and delay of the state court litigation), and then, after having the protection of the bankruptcy court, leaves bankruptcy, at will, as soon as the debtor has obtained its goal (obstruction and delay) but without the creditors obtaining any of the protections and benefits (reorganization or liquidation) which the Bankruptcy Code gives to creditors. Chapter 13 debtors have the light to dismiss their chapter 13 cases at will, pursuant to 11 U.S.C. § 1307(b). Chapters 7 and 11 do not have a similar provision allowing at will dismissal by debtors. Debtors wanting dismissal of their chapter 7 or chapter 11 case must move the Court to dismiss the chapter 7 or 11 case, on notice to the trustee, the U.S. Trustee, and all creditors, and must show "cause" for dismissal. 11 U.S.C. § 1112(b); 11 U.S.C. § 707(a). Debtor did not cite any authority supporting the proposition that a chapter 7 or chapter 11 debtor's change of mind regarding being in bankruptcy is "cause" to dismiss a chapter 7 or chapter 11 bankruptcy.

### 1. Debtor Chose Chapter 11 Instead of Chapter 7 to Keep Control and Stall

Debtor was not eligible for a Chapter 13 because Debtor was far over the debt limit imposed by 11 U.S.C. § 109(g). The Court found, based on all facts and circumstances, that Debtor filed chapter 11, rather than chapter 7, because in chapter 7, a chapter 7 trustee would have been appointed and could be expected to: (1) sell Debtor's residence to obtain the substantial ($98,000) available equity in the residence, over the liens and exemption amount, and (2) most likely would have settled the state court action with Coppersmith either by giving Coppersmith the commercial building at the $3,950,000 option price, or for some agreed higher price, either which would have obtained enough money to pay all creditors 100% or close to 100%.

Debtor filed chapter 11 to remain "in possession" because Debtor wanted to use bankruptcy to stall creditors as long as possible while avoiding selling his personal residence, and while refusing to settle with Coppersmith, in the hope that Coppersmith would lose the specific performance suit, so that there would be value left for the Debtor above the amounts owed to creditors. Debtor's incentive for the litigation with Coppersmith was that, in a surplus case, the debtor retains all equity above amount necessary to pay creditors 100%, and if Silberkraus' case was not a surplus case, the creditors, not Debtor, were harmed, because Debtor was spending the creditors' money to litigate with Coppersmith. This way, Debtor either received value, or only lost the creditors' money.

### 2. Applicable Ninth Circuit Case Law Does Not Allow a Debtor to File Bankruptcy Solely to Obstruct Pending State Court Specific Performance Litigation

In *In re Chinichian*, 784 F.2d 1440 (9th Cir.1986), the Ninth Circuit affirmed a bankruptcy court's decision to reject a chapter 13 plan of reorganization as not being filed in good faith when the reorganization plan was filed for the purpose of preventing consummation of a state court specific performance judgment which would have required debtors to honor a contract for the sale of their home. In *Chinichian* the Court noted that the record showed that the debtors were not having difficulty meeting their financial obligations, that there was essentially a lack of unsecured debt, that there was no meaningful provision in the plan to sell certain properties, that there was a **strategic timing of the bankruptcy which frustrated enforcement of the contract in state court,** and that the bankruptcy case was **filed for the purpose defeating the specific performance action.** *In re Chinichian,* 784 F.2d at 1445.

The facts in the herein case are strikingly similar to those in *Chinichian*. In this case, the Debtor Silberkraus had millions of dollars of equity in his properties. As detailed in **Part I supra,** Debtor had a total of $1,130,579.60 in equity in the commercial property and residence above all liens, even assuming that Coppersmith's option to purchase was enforceable by Coppersmith. Therefore, Debtor Silberkraus was very solvent on the petition date. Debtor's income and expenses on the petition date—Schedule I showed income of $30,500/month, Schedule J showed expenses of $28,556/month—show that the Debtor Silberkraus was not having difficulty meeting his financial obligations as they came due. Other than the disputed unsecured claims of Coppersmith and Seeley, and the unsecured claims Debtor incurred in the month prior to filing (including the amounts to pay his bankruptcy attorneys' retainer), there was essentially a lack of unsecured debt. Debtor's plan and disclosure statement did not contain any meaningful mechanism for refinancing or selling of the commercial property (though it claimed to be trying to achieve these ends). Debtor's timing in the filing of this case was strategic—Silberkraus filed just days before a status conference in state court where the state court was to

set a trial date to try the state court specific performance action. Based on a review of these facts, the inference ·to be drawn is the same as the court drew in *Chinichian,* i.e., that Silberkraus filed bankruptcy for the purpose of delaying and defeating the pending state court specific performance action. Per *Chinichian,* it was bad faith for Debtor Silberkraus to seek to use bankruptcy to alter whatever result would have been achieved by continuing to litigate the state court action with Coppersmith and Seeley. Consequently, the Debtor Silberkraus should merely have continued to litigate the specific performance action with Coppersmith and Seeley in state court, instead of filing bankruptcy. Filing bankruptcy was contrary to *In re Chinichian,* which is the controlling law in the Ninth Circuit.

### 3. Filing Bankruptcy to Impede Litigation Pending in a Nonbankruptcy Forum is Bad Faith

■ *In re Chinichian,* discussed supra, is merely one of numerous cases holding that it constitutes bad faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in nonbankruptcy forum—whether ·that nonbankruptcy forum is a state court or a federal district court. *In re SGL Carbon Corp.,* 200 F.3d 154 (3d Cir.1999) (bad faith for debtor to file bankruptcy to seek to gain a tactical litigation advantage in pending antitrust litigation); *In re Start the Engines, Inc.,* 219 B.R. 264 (bankruptcy filed in bad faith because petition filed for the improper purpose of delaying a state court action; court sanctioned debtor's president and debtor's attorney for bad faith); *St. Paul Self Storage Ltd. Partnership v. Port Authority of the City of St. Paul (In re St. Paul Self Storage Ltd. Partnership),* 185 B.R. 580 (9th Cir. BAP 1995) (bad faith for debtor to file bankruptcy one day prior to a hearing on a creditor's discovery motion in state court litigation revolving around a lease that was allegedly owned by debtor); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393 (11th Cir. 1988) (bad faith for debtor to file bankruptcy the day before the state court was to hold a hearing on the appointment of a receiver, thereby delaying and frustrating the enforcement efforts of secured creditors); *Albany Partners, Ltd v. W.P. Westbrook, Jr. (In re Albany Partners Ltd.),* 749 F.2d 670 (11th Cir.1984) (bad faith for debtor to file bankruptcy to frustrate the legitimate enforcement efforts of the secured creditors when the bankruptcy was filed after the state court granted a writ of possession and appointed a receiver, and on the eve of foreclosure); *see also, Little Creek Dev't Co. v. Commonwealth Mortgage Corp. (In Matter of Little Creek Dev't Co.),* 779 F.2d 1068 (5th Cir.1986) (the seminal bad faith case, which opined, inter alia, that it is bad faith to file bankruptcy as a follow on to state court litigation).

Filing the bankruptcy to delay state court litigation was also the problem in *In re Walter,* 108 B.R. 244 (Bankr.C.D.Cal. 1989), where this Court dismissed the Walters' chapter 11 case as being filed in bad faith, on facts rather similar to the facts in the instant Silberkraus chapter 11 case. In *In re Walter,* the debtors had sufficient assets to pay all their creditors in full, and were engaged in state court litigation with debtors' only secured creditor. The Walters were using the bankruptcy automatic stay as a substitute for getting a preliminary injunction enjoining the secured creditor from foreclosing on the Walters' real property, because the state superior court and state court of appeal had denied giving the Walters such a preliminary injunction.

■ Also relevant by analogy are the numerous cases holding that it is bad faith to file bankruptcy as a substitute for posting an appeal bond after losing state court litigation. *Chu v. Syntron Bioresearch, Inc. (In re Chu),* 253 B.R. 92 (S.D.Cal. 2000) (debtor filed bankruptcy to collaterally attack a state court judgment, to avoid posting a bond, and to prevent the creditor from recovering on the judgment); *In re Erkins,* 253 B.R. 470 (Bankr.D.Idaho 2000)

(debtor's sole objective was to stay collection efforts while continuing to fight an appeal without posting a proper appeal bond); *Little Creek Dev't Co. v. Commonwealth Mortgage Corp. (In Matter of Little Creek Dev't Co.)*, 779 F.2d 1068 (5th Cir. 1986) (debtor filed bankruptcy after failing to post a bond for a preliminary injunction against foreclosure); *In re Boynton*, 184 B.R. 580 (Bankr.S.D.Cal.1995) (debtor filed the chapter 11 petition to prevent the IRS from enforcing its judgment, and to avoid posting a bond on appeal).

■ The overall teaching of this whole collection of cases is that two party disputes in state court (or federal district court) should be resolved through the normal litigation process in those forums, and that it is bad faith to file bankruptcy instead of continuing with the normal litigation process in the nonbankruptcy forums. Debtor Silberkraus and his bankruptcy attorneys ignored this whole body of case-law.

### 4. Filing Bankruptcy Solely to Attempt to Reject an Executory Contract or Lease is Bad Faith

■ A number of bankruptcy and Circuit level decisions have held that filing bankruptcy with the sole purpose of trying to reject an executory contract or lease is bad faith, and the rejection will be precluded. As stated by the Ninth Circuit BAP, "it is not true that solvent debtors may petition for bankruptcy and then obtain a windfall by rejecting their executory contracts...." *In re Chi–Feng Huang*, 23 B.R. 798, 803 (9th Cir. BAP 1982). *See also, In re Carrere*, 64 B.R. 156 (Bankr. C.D.Cal.1986) (finding that there is not "cause" to reject a contract if the major motivation of the debtor in filing the case is to be able to perform under a more lucrative contract); *In re Southern California Sound Systems, Inc.*, 69 B.R. 893 (Bankr.S.D.Cal.1987) (debtor, whose sole reason for filing for Chapter 11 relief was to reject exclusive licensing contract, would not be allowed to reject contract); *In re Waldron*, 785 F.2d 936 (11th Cir. 1986); *Lubrizol Enterprises, Inc. v. Rich-*

*mond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (the debtor's decision to reject an executory contract should be accepted by the court unless it is shown to be "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.") Debtor's proposed plan called for leasing or selling the commercial property in the open market, which was supposed to be achieved by rejecting Coppersmith's lease and option to purchase. Yet 11 U.S.C. § 365 rejection of the option to purchase and lease, even if assumed arguendo to be available, would *not* have accomplished what Debtor sought to accomplish.

### 5. Section 365 Rejection of the Coppersmith Option to Purchase, Even if Allowed, Would Not Accomplish the Goals Debtor Sought

#### a. *If Debtor used Section 365 to Reject Coppersmith's Option to Purchase, Section 365(i) Would Give Coppersmith the Right to Remain in Possession and Get Title to the Property, Despite the Rejection*

■ 11 U.S.C. § 365(i) states:

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession—

(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date

from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

Section 365(i) is designed to protect buyers in possession of property, where a debtor has contracted, prepetition, to sell to the buyer, and thereafter in bankruptcy seeks to avoid selling. *McCannon v. Marston,* 679 F.2d 13 (3d Cir.1982). The language in this provision does not require the purchaser in possession to be in possession under any particular type of executory contract, such as a "land installment sales contract." *In re Maier,* 127 B.R. 325 (Bankr.W.D.N.Y.1991). This scheme was set up by Congress to protect those who deal with a debtor when the debtor is the owner of real property.

 Under California law, when an option to buy contained in a lease is properly accepted, the option becomes a binding contract of purchase. *See Claremont Terrace Homeowners' Ass'n v. United States,* 146 Cal.App.3d 398, 406, 194 Cal. Rptr. 216 (1983) (stating "[a]n option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract"). In this case, it is undisputed that Coppersmith exercised the option to purchase in accordance with the terms contained therein. Upon doing so, the option to purchase transformed into a contract of purchase and sale. Accordingly, if Debtor was able to use Section 365 to reject this contract of sale, Coppersmith, as buyer, would be entitled to the protec-

tions afforded a purchaser in possession under Section 365(i).[4] *See also, In re Maier,* 127 B.R. 325, 327 (Bkrtcy.W.D.N.Y. 1991) (holding that a debtor may reject a contract with an option to purchase which has been exercised, but that the lessee is entitled to the protection afforded a purchaser in possession pursuant to Section 365(i)).

Coppersmith testified that it would choose to remain in possession pursuant to Section 365(i)(1); and Debtor would have ultimately had to deliver title of the property to Coppersmith, pursuant to Section 365(i)(2)(B). Based on this, Debtor's result in bankruptcy would be no better than whatever result Debtor could have achieved by continuing to litigate the pending state court specific performance action with Coppersmith and Seeley in state court.

**b.** ***If Debtor Rejected Coppersmith's Option to Purchase, Pursuant to Section 365, Most of the Value Obtained by Either Selling the Commercial Property at the Fair Market Value or Leasing the Property at a Higher Rental Rate Would Have to be Paid Back to Coppersmith to Pay Coppersmith's Section 365 Rejection Damages Claim***

 Assuming arguendo that the Court allowed Debtor to use 11 U.S.C. § 365 to reject Coppersmith's option to purchase, Coppersmith would have had a claim for the damages caused by that rejection. The damages caused by that rejection (assuming the option to purchase was valid and enforceable) would have been, at a minimum, the difference between the option price and the fair market value of the commercial property on the date the bankruptcy was filed. *See In re*

4. Debtor argues that Coppersmith was not a purchaser in possession because Coppersmith sublet the premises to TRW, Inc. (*See* Debtor's Consolidated Opposition to (1) L.E. Coppersmith, Inc., for an Award of Sanctions; and (2) Motion of The Seeley Company for Attorney's Fees.) However, the test under whether a purchaser is "in possession" appears to revolve around a "concern for buyers whose connection with the land is more permanent than ephemeral, more continuous than intermittent, more exclusive than shared...." *In re Summit Land Co.,* 13 B.R. 310, 318 (Bankr. D.Utah 1981). Here, there does not appear to be any evidence which would suggest that Coppersmith does not have a permanent connection with the commercial property.

*Aslan,* 909 F.2d 367 (9th Cir.1990) (also an option to purchase case, where the court held that the date of the breach of an executory contract that is rejected by a debtor under the Bankruptcy Code is the date immediately prior to filing the bankruptcy petition for the purpose of calculating damages). That measure of damages would not take into account the value of the right to specific performance, i.e., right to possess/obtain title to the commercial property.

Even if Debtor could have used Section 365 to reject the Coppersmith option to purchase, and then sold the property elsewhere at fair market value, Coppersmith would have had a damage claim from that rejection equal to the full amount debtor could have obtained, over the option price, by doing so. Per Section 365, that claim would have been a general unsecured claim. The value debtor obtained by selling the property in the open market above option price, or by leasing it in the open market at an enhanced rental rate, would have been shared by all priority and general unsecured creditors (the secured creditors would have been paid from escrow). However, because there was very little unsecured debt in this case other than whatever unsecured claim Coppersmith would have had, Coppersmith, by being the bulk of any general unsecured class, would have received the bulk of the proceeds above option price, by sharing pro rata with the few other general unsecured creditors.

**6. Even if All Silberkraus had was a Lease, With No Enforceable Option to Purchase, Section 365 Rejection of the Lease Would Not Have Accomplished that which Debtor Sought to Accomplish**

**a. *Per Section 365(h), Coppersmith Would be Able to Stay in the Commercial Property, Even if Coppersmith Was Only a Tenant, with No Option to Purchase***

Section 365(h)(1)(A)(ii) provides:

If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—if the term of the lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

This provision of the Bankruptcy Code gives the lessee the option of either considering the lease terminated or staying in possession of the property for the balance of the current term and exercise any right to extension or renewal. *In re Arden & Howe Assoc., Ltd.,* 152 B.R. 971 (Bankr. E.D.Cal.1993). The purpose of 11 U.S.C. § 365(h)(1) is to "afford the debtor the benefit of rejecting an undesirable lease while at the same time protecting the property rights of the lessee." *In re LHD Realty Corp.,* 20 B.R. 717, 719 (Bankr. S.D.Ind.1982).

In the instant case, the Debtor is the lessor of the commercial property, and Coppersmith is the lessee. As stated in **Part I** supra Coppersmith took the precaution of renewing the term of the lease on June 28, 1999 from 3/2000 to 3/2005. Therefore, if Debtor attempted to reject the lease, Section 365(h)(1)(A)(ii) would give Coppersmith the right of staying in possession of the property until 3/2005, and, at that time, any further right to extension or renewal that the lease provided.

Debtor's Opposition to the motions for sanctions contends that the effect of Section 365(h) is "grossly mischaracterized."

(*See* Debtor's Consolidated Opposition to (1) L.E. Coppersmith, Inc., for an Award of Sanctions; and (2) Motion of The Seeley Company for Attorney's Fees.) However, no authority is cited by Debtor for ignoring the plain language of 11 U.S.C. § 365(h), which by its wording, gives Coppersmith the right to stay in the premises for the remainder of the lease.

### b. *A Section 365 Lease Rejection, Even if Granted, Would Not Have Produced a Substantial Net Gain to Debtor Due to the Lease Rejection Damages*

█ Even if one assumes arguendo that Coppersmith's option to purchase was invalid, that Debtor used Section 365 to reject Coppersmith's lease, that Section 365(h) did not give Coppersmith a right to continue to occupy, and that Section 365(i) did not give Coppersmith a right to purchase, Coppersmith would, at a minimum, have had a Section 365 lease rejection claim for the difference between its lease rental rate and the open market rental rate. If the Debtor leased the commercial building at a higher market rate than the rate Coppersmith was paying, that increase in rent would have had to be distributed to the creditors, pursuant to any chapter 11 plan. Coppersmith would have been largest general unsecured creditor, due to its Section 365 lease rejection claim. Because there were few unsecured creditors other than Coppersmith, Coppersmith—in its capacity as a general unsecured creditor holding a large rejection claim—would have had to be paid the bulk of additional profit obtained in the open market from the increased rental rate.

Due to the law discussed in this Section, bankruptcy could not be used to obtain substantially more benefit from the commercial building than whatever result completing the pending state court litigation would have produced. In light of this fact, Debtor filing bankruptcy, though he was very solvent, was purely to delay and forum shop. The chapter 11 case was filed

for the improper purpose of impeding the state court action, when bankruptcy (controlling Ninth Circuit case law such as *Chinichian*, and Bankruptcy Code Section 365) would not allow using the bankruptcy to obtain more value than could have been obtained by continuing to litigate the pending state court action. Debtor should merely have continued to litigate the state court specific performance action, instead of filing bankruptcy. Even if a Section 365 rejection of the Coppersmith option to purchase and lease would have been available, such rejections could not substantially change what result would have been obtained by completing the state court specific performance litigation.

### B. Applicable Law Mandates Granting Creditors' Motions for Monetary Sanctions Against Debtor and Debtor's Counsel, for Bad Faith, Per Both F.R.B.P. Rule 9011 and 11 U.S.C. § 105

As detailed supra in **Part I,** Coppersmith and Seeley each filed motions moving the Court to sanction the Debtor, Dressler, Esq. and the Dressler law firm, pursuant to F.R.B.P. Rule 9011 and 11 U.S.C. § 105, for bad faith conduct. Coppersmith moved for sanctions against these three respondents in the amount of $97,429.67, representing the attorney fees that Coppersmith was billed/paid Coppersmith's attorneys to defend Coppersmith against the Debtor's chapter 11 case. This amount was itemized by detailed time records showing the tasks and the time spent to the date the sanctions motion was filed, and was supported by declarations of Coppersmith's attorneys. Seeley moved for sanctions of $17,964.00 against these three respondents, representing the fees Seeley incurred to defend against the chapter 11 case. This amount was itemized by detailed time records showing the tasks and the time spent to the date the sanctions motion was filed, and supported by a declaration from Seeley's attorney. Coppersmith's and Seeley's attorneys stated under

penalty of perjury at the hearing that they had or would bill, and had or would attempt to collect those full amounts from their respective clients. These fees included moving for relief from stay, moving to convert, objecting to the disclosure statement, responding to the Court's Order to Show Cause to Dismiss, opposing Debtor's request to use cash collateral, and all other appearances from filing to the dates the sanctions motions were filed. . ·

■ The Coppersmith and Seeley sanctions motions clearly identified Dressler, Esq. and the Dressler law firm as being co-respondents against whom an award of sanctions was sought. Debtor's attorneys filed an Opposition on behalf of Debtor to these two sanctions motions, but none on behalf of themselves. The Opposition (captioned as "Consolidated Opposition" because it opposed both the Coppersmith Sanction Motion and the Seeley Sanction Motion) filed by Debtor's attorneys is not captioned as being on behalf of any respondent except Debtor. Nor does the Opposition argue on behalf of any party except Debtor. (See Debtor's Consolidated Opposition to (1) L.E. Coppersmith, Inc., for an Award of Sanctions; and (2) Motion of The Seeley Company for Attorney's Fees.) Pursuant to Central District of California Local Bankruptcy Rule 9013–1(k), "[p]apers not timely filed and served may be deemed by the Court to be consent to the granting or denial of the motion, as the case may be." The failure of Dressler, Esq. and the Dressler law firm to file any written Opposition to the two sanctions motions on their own behalf, as respondents, is a waiver of these attorneys' right to object to the Court granting sanctions against the attorneys.

After hearing an additional three hours of oral argument on the sanctions motions on September 5, 2000, the Court granted both the Coppersmith and Seeley motions for sanctions, pursuant to the alternative separate grounds of F.R.B.P. Rule 9011 and 11 U.S.C. § 105, sanctioning Debtor, Dressler, Esq., and the Dressler law firm

jointly and severably for bad faith filing and prosecution of the chapter 11 bankruptcy case. However, the Court only granted sanctions in one-half of the dollar amount sought in each motion (i.e., $48,714.84 to Coppersmith against the three respondents, jointly and severably, instead of the $97,429.67 sought, and $8,982 to Seeley against the three respondents, jointly and severably, instead of the $17,964.00 sought). The Court awarded these monetary sanctions to be paid within 30 days of entry of order.

As announced at the hearing, the Court's reasoning for the sanction award was that, for all reasons stated above, the filing and prosecution of the chapter 11 case was in bad faith. However, the Court's converting the bankruptcy case from chapter 11 to chapter 7, as opposed to merely dismissing the bankruptcy case, constituted **mitigation** of the damage the creditors would otherwise have suffered. Conversion to chapter 7 would mitigate the creditors' damages because whatever chapter 7 trustee was appointed would have a duty to promptly liquidate the estate property, which would result in payment of all or substantially all of the amounts owed to all creditors. It was because of the mitigating effect of the conversion from chapter 11 to chapter 7 that the Court only awarded one-half of the dollar amount of sanctions sought by Coppersmith and Seeley. If the Court had dismissed the case, the Court would have awarded the full dollar amount of sanctions sought.

By stipulation of the parties, the parties agreed that Debtor, and/or Debtor's attorneys could obtain a stay pending appeal by posting a supersedeas bond in the amount statutorily required to bond a money judgment pending appeal (i.e., money bond of 150% of sanctions amount).

### 1. Case Law Test for Applying F.R.B.P. Rule 9011

*In re Marsch,* 36 F.3d 825 (9th Cir.1994) is the controlling Ninth Circuit case addressing the award of F.R.B.P. Rule 9011

sanctions for filing a bankruptcy petition in bad faith. *See also, In re Villa Madrid,* 110 B.R. 919 (9th Cir. BAP 1990) (affirming the award to creditors of $15,509.70 in sanctions against counsel of chapter 11 debtor, when counsel should have known that the petition was filed in bad faith, to try to obtain a new venue); and *In re Start the Engines, Inc.,* 219 B.R. 264 (Bankr.C.D.Cal.1998) (awarding creditor $10,000 in sanctions against debtor's president and debtor's attorney based on the finding that the petition was for the improper purpose of delaying a state court action).

 F.R.B.P. Rule 9011 provides that by signing a pleading (here, a bankruptcy petition), the party and the attorney who sign are warranting that the pleading is not for an improper purpose, is warranted by existing law, and has evidentiary support. Pursuant to *Marsch* and cases following it, a bankruptcy court is required to use a sliding scale test to determine whether a bankruptcy petition is filed in bad faith, and therefore is sanctionable pursuant to F.R.B.P. Rule 9011. As stated in *Marsch,* "bankruptcy courts must consider both frivolousness and improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other." *In re Marsch,* 36 F.3d at 830.

 Applying the *Marsch* test here compels sanctioning the filing of the petition under F.R.B.P. Rule 9011, as having been filed for both a frivolous and an improper purpose. Looking at the first prong—improper purpose—the evidence is extremely strong. Debtor—who was clearly solvent on the petition date—admitted that the bankruptcy was filed to try to impede the pending state court specific performance suit, and opposed Coppersmith's and Seeley's motions seeking relief from stay to proceed with the state court specific performance action. Debtor never brought an 11 U.S.C. § 365 motion seeking to reject either the option to purchase or the lease. Even if Debtor had sought and obtained a Section 365 rejection of the option or the lease, applicable law detailed supra precluded Debtor from getting more value through the bankruptcy case than whatever result could have been achieved by merely continuing to litigate the state court action. Furthermore, Debtor filed chapter 11 rather than chapter 7 to keep control of the estate, and to avoid having a chapter 7 trustee appointed, because a chapter 7 trustee could have been expected to liquidate all of the property to pay creditors—including Debtor's personal residence.

Looking at second issue—frivolousness—the evidence is also strong. As briefed supra herein, applicable Ninth Circuit case law—particularly *In re Chinichian*—and the relevant Bankruptcy Code provisions—particularly 11 U.S.C. §§ 365(h), and (i)—do not allow using the bankruptcy to oust Coppersmith from the commercial property, do not allow bankruptcy to be used to keep Coppersmith from getting title if the option to purchase was valid, and do not allow Debtor to use bankruptcy to obtain substantially more value than what would have been produced by litigating the state court action. Consequently, filing a chapter 11 petition to seek to obtain these results was frivolous based on applicable law.

 With strong evidence on both prongs, Rule 9011 required the court to sanction the filing of the chapter 11 petition. Rule 9011 directs the Court to limit the sanctions to an amount necessary to deter repetition of such conduct or comparable conduct by others similarly situated. The Court awarded minimum sanctions necessary to avoid comparable conduct by other debtors and debtors' attorneys similarly situated. The Court would have awarded the full amount sought by each creditor, but for conversion to chapter 7. The Court cut the dollar amount of sanctions to one-half of the dollar amount Coppersmith and Seeley moved for, because, by virtue of the Court's converting the

case from chapter 11 to chapter 7, the creditors will obtain (at least belatedly) the things Congress intended that creditors would obtain via the Bankruptcy Code, i.e., orderly liquidation of estate assets with payment to creditors pursuant to the priority scheme of the Bankruptcy Code.

Many of the things Coppersmith and Seeley had to expend money on in the chapter 11 case—such as objecting the Debtor's chapter 11 disclosure statement and plan—would not have been necessary if the case had been filed as a chapter 7. Moreover, had the case been filed as a chapter 7, the creditors very likely could have negotiated with the chapter 7 trustee to get stipulated relief from stay to proceed with the state court action, and/or could have settled the state court action with the trustee. Finally, the motion to convert would have been unnecessary, and the trustee may not have moved to use cash collateral.

 F.R.B.P. Rule 9011 has a "safe harbor." For most pleadings, Rule 9011 gives the party who filed the allegedly improper pleading 21 days after service of the 9011 motion to withdraw the pleading before the movant can actually file the 9011 motion with the court. However, the filing of bankruptcy petition is exempted from the "safe harbor." *See* The Advisory Committee Notes to the 1997 Amendment: "This rule is amended to conform to the 1993 changes to F.R.Civ.P. 11. For an explanation of these amendments, see the advisory committee note to the 1993 amendments to F.R.Civ.P. 11. The "safe harbor" provision contained in subdivision (c)(1)(A), which prohibits the filing of a motion for sanctions unless the challenged paper is not withdrawn or corrected within a prescribed time after service of the motion, does not apply if the challenged paper is a petition."

### 2. 11 U.S.C. § 105 is a Separate, Alternative Ground Mandating Award of Sanctions

 As a separate, alternative ground, the Court awarded these same sanctions

using its inherent power to sanction bad faith conduct, pursuant to 11 U.S.C. § 105(a). In *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278 (9th Cir.1996), the Ninth Circuit held that a bankruptcy court has the inherent power, pursuant to the statutory grant Congress provided the bankruptcy courts in 11 U.S.C. § 105(a), to sanction bad faith conduct. In *Rainbow Magazine*, the Ninth Circuit began its analysis by referring to *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), in which the Supreme Court held that federal district courts possess the inherent power to sanction bad-faith litigation conduct that falls outside the scope of F.R.C.P. Rules 11 or 28 U.S.C. § 1927. Next, the Ninth Circuit pointed to 11 U.S.C. § 105(a) and stated that "There can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct presented before the court." *Id.* at 284. The Ninth Circuit interpreted the language "to prevent an abuse of process" in §105(a) to be an implicit recognition by Congress that bankruptcy courts have the same inherent power that *Chambers* recognized Article III courts possess. *See also, Havelock v. Taxel (In re Pace)*, 159 B.R. 890 (9th Cir. BAP 1993) (awarding chapter 7 trustee attorney fees as sanctions against debtor's attorneys because of the debtor's attorneys' violations of the stay); *In re Courtesy Inns, Ltd., Inc.*, 40 F.3d 1084 (10th Cir.1994) (affirming imposition of sanctions against debtor's president when the sole purpose of filing bankruptcy was to delay creditor from foreclosing, and holding that Section 105 imbues the bankruptcy court with inherent powers recognized in *Chambers* ).

The only effective way to deter filing and prosecuting bankruptcy cases in bad faith is to impose monetary sanctions against *both* the debtor and debtor's counsel who do this. Dismissal is not effective

to control bad faith filings, as shown by this case. Having obtained seven months of delay via filing and prosecuting his chapter 11 case in bad faith, Debtor was only too happy to consent to dismissal with a 180 day bar. Why? Because Debtor knew it would take more than six months to finish litigating the state court specific performance actions (in light of possible appeals, it takes years to complete any state court action through appeal). The 180 bar would expire and Debtor would file another bankruptcy case, and obtain another dose of delay (or multiple bankruptcy cases with multiple doses of delay). This reality was an additional reason the court chose conversion to chapter 7 over dismissal.

In this case creditors Coppersmith and Seeley were forced to expend $115,393.67 in attorney fees in seven months, to protect their positions in a chapter 11 bankruptcy case that was filed and prosecuted in bad faith. In determining whether to assess monetary sanctions the Court has two choices: (1) the Court can punish the guilty—by levying monetary sanctions against the Debtor and Debtor's attorneys who filed and prosecuted the chapter 11 case in bad faith, thereby forcing creditors Coppersmith and Seeley to expend attorney fees to defend their positions in a chapter 11 case which should not have been filed; or (2) the Court can punish the innocent, by refusing to order Debtor and Debtor's attorneys to pay monetary sanctions to reimburse these creditors for the attorney fees these creditors were forced to expend due to Debtor and Debtor's attorneys filing and prosecuting of the chapter 11 bankruptcy in bad faith. Awarding sanctions to pay some or even all the attorney fees a creditor expends defending its position in a bankruptcy filed in bad faith does not get the creditor ahead. In fact, such an attorney fee award does not even get the creditor even, because the creditor is not compensated for the time value of the delay caused by the bankruptcy case, even if all of the creditor's attorneys fees are paid via or-

dering the debtor or debtor's counsel to pay monetary sanctions to the creditor in the amount of the attorney fees expended by the creditor.

Until monetary sanctions are awarded against attorneys who file and prosecute bankruptcy cases in bad faith, attorneys have every incentive to continue filing and prosecuting petitions in bad faith, because debtors pay these attorneys legal fees for doing so. Here, Debtor's attorneys received a $50,000 retainer for representing Debtor in this case, and doubtless would have requested fees exceeding the retainer. When choosing between punishing the **guilty** for bad faith, improper filing and prosecution of a frivolous chapter 11 case (by requiring Debtor/Debtor's attorneys to pay monetary sanctions to the creditors to reimburse the creditors' attorney fees), and punishing the **innocent** (by refusing to order the Debtor/Debtor's counsel to pay the creditors' attorney fees caused by the Debtor's/Debtor's attorneys' improper filing and prosecution of a chapter 11 case in bad faith), both F.R.B.P. Rule 9011 and 11 U.S.C. § 105(a) mandate sanctioning the guilty parties, i.e., Debtor and Debtor's attorneys.

### 3. Standard of Proof

■ Debtor cites *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469 (D.C.Cir.1995) for the contention that inherent power findings must be based on clear and convincing evidence. (*See* Objections of (1) Debtor; (2) Thomas W. Dressler; and (3) Dressler Rein Evans and Sestanovich, LLP to Form of Order Re Sanctions Lodged by (a) Coppersmith, Inc. and (b) The Seeley Company.) Although *Shepherd,* and one additional district court decision, *Samuel v. Michaud,* 980 F.Supp. 1381 (D.Idaho 1996), enunciate the clear and convincing standard, the Court can find no wording in 11 U.S.C. § 105(a), or in controlling Ninth Circuit case law, suggesting that awarding sanctions under the court's inherent power

must be based on clear and convincing evidence, rather than on the normal standard of proof in civil matters—proof by a preponderance of the evidence. Nor, for that matter, does F.R.B.P. Rule 9011 contain the words, "clear and convincing." The law in the Ninth Circuit merely states that a court's authority to sanction under the court's inherent powers is limited to when the court makes an "explicit finding that ... conduct 'constituted or was tantamount to bad faith.'" *Primus Automotive Fin. Serv., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997). Here, the Court has made explicit findings of bad faith, at the hearing, and as detailed herein. Furthermore, even if clear and convincing evidence was required, the evidence described herein proved the bad faith of Debtor and of Debtor's attorneys by clear and convincing evidence, in violation of F.R.B.P. Rule 9011, and mandating sanctions under 11 U.S.C. § 105(a).

### III. Conclusion

This opinion constitutes the Court's findings of facts and conclusions of law regarding the three motions here in issue—the motion to convert filed by Coppersmith, and joined in by Seeley, and the two motions for monetary sanctions—one filed by Coppersmith and one filed by Seeley. The Court's Order on the motion to convert was entered on September 11, 2000, and the Court's Orders on the two motions for sanctions were both entered on September 25, 2000.